# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00341-SCT

*JOHN WATSON*

*v.*

*MARY WATSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/97 |
| TRIAL JUDGE: | HON. WILLIAM H. MYERS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DEMPSEY M. LEVI |
| ATTORNEY FOR APPELLEE: | W. HARVEY BARTON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 12/10/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/31/98 |

**BEFORE SULLIVAN, P.J., BANKS AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. In a divorce action, the Chancery Court of Jackson County, Honorable William H. Myers granted Mr. John Watson (hereinafter "Jack") and Mrs. Mary Watson (hereinafter "Mary") a divorce on the grounds of irreconcilable differences. Judgment was entered in this matter on September 4, 1996. An amended Order was entered on February 19, 1997 and an Amended Judgment Nunc Pro Tunc was filed on July 21, 1997. Pursuant to said Judgments, the Court awarded the following:

1. Divorce on the grounds of irreconcilable differences as stipulated by the parties.

2. Mary is awarded the exclusive use and possession of the family home located in Moss Point, together with all of its contents. Jack is to pay the monthly mortgage payment on the marital home of the parties, to include taxes and insurance for a period of six years from the date of the Judgment. Afterwards, the marital home shall be sold and the equity divided equally between the parties.

3. Jack is awarded the use and possession of his boat, tools and all items belonging to him which are

located in the shop behind the premises of the family home.

4. Mary receives a twenty-five (25%) percent interest in all retirement accounts in Jack's name, in which he had an ownership interest as of the date of the parties' separation and which retirement benefits had accrued during the parties' marriage. This stock shall include the following:

Affiliated Financial Consultant's account - 527319

Affiliated Financial Consultant's account - A6K-801127

Skandia Annuity account - 722985

Savings Bonds

5. Jack is to pay all outstanding medical bills incurred by Mary until the date of the Judgment, including the medical bills of Dr. Roy Dear and Dr. Deal's charges for appearing as an expert witness in the amount of seven hundred twenty ($720.00) dollars.

6. Jack shall pay six thousand ($6,000.00) of Mary's attorney's fees along with all court costs.

Mary was also awarded periodic alimony in the amount of $1,000.00 per month.

¶2. Jack appeals this decision raising the following assignments of error:

**I. WHETHER THE CHANCERY COURT ERRED IN AWARDING EXCLUSIVE USE OF THE MARITAL HOME TO MARY AND FURTHER ERRED IN ORDERING JACK TO PAY THE MORTGAGE FOR A PERIOD OF SIX YEARS?**

**II. WHETHER THE CHANCERY COURT ERRED IN AWARDING PERIODIC ALIMONY TO MARY IN THE AMOUNT OF ONE THOUSAND ($1,000.00) DOLLARS PER MONTH?**

**III. WHETHER THE CHANCERY COURT ERRED IN ORDERING JACK TO PAY MARY'S MEDICAL BILLS INCURRED THROUGH THE DATE OF THE FINAL JUDGMENT?**

**IV. WHETHER THE LOWER COURT ERRED BY AWARDING MARY AN INTEREST IN THE RETIREMENT ACCOUNTS OF JACK?**

**V. WHETHER THE CHANCERY COURT ERRED IN REGARD TO THE DIVISION OF PERSONAL PROPERTY OF THE PARTIES?**

**VI. WHETHER THE CHANCERY COURT ERRED IN FAILING TO CONSIDER MARY'S SUBSTANTIAL ASSETS AS MARITAL PROPERTY SUBJECT TO DIVISION?**

**VII. WHETHER THE CHANCERY COURT ERRED IN ORDERING JACK TO PAY SUMS OF MONEY PAST THE AGE OF RETIREMENT?**

**VIII. WHETHER THE CHANCERY COURT ERRED IN AWARDING ATTORNEY'S**

**FEES TO MARY?**

## STATEMENT OF THE FACTS

¶3. Jack first met Mary, a citizen of Malaysia, while he was working in Singapore with Chevron. Approximately one year later, Jack returned to Singapore where he renewed his acquaintance with Mary. Jack suggested that Mary visit her sister and adopted son living in England and afterwards, visit him in Germany where he would be located in November. During the course of her travels, Mary's money and passport were stolen. While waiting in England to obtain a new passport, Jack proposed to Mary. She agreed to marry Jack. Mary stayed with her sister in England while Jack made arrangements for her visa to the United States. This process took approximately nine months. Mary arrived in the United States in April 1988, and the couple married on July 30, 1988. During the course of the marriage, there were no children born unto the parties.

¶4. Jack retired from the U.S. Coast Guard on August 1, 1970, as a Lt. Commander after approximately twenty (20) years of service. After retiring from the Coast Guard, Jack worked for several years as a plant manager for a steel mill in California. He worked the next few years as a service engineer for Marcona Corp. In 1981, Jack became employed as an engineer with Chevron USA, Pascagoula, Mississippi. He was employed by Chevron at the time he met Mary. After retiring from Chevron in October 1992, Jack became employed with Industrial Maintenance and Machine on a retainer basis only. Jack receives a retainer of $150.00 per week less taxes and Social Security regardless of whether he is called to work or not. At trial, Jack expected his employment to continue as long as it is profitable for the company. Mary was unemployed throughout the course of the parties' marriage.

¶5. Jack owned a boat and resided on the boat prior to and at the time he met Mary. He purchased the boat for $135,000.00. At the time of purchase, Jack put $55,000.00 down on the boat. His monthly payment on the boat is $845.06. When Mary came to the United States, she began living on the boat with Jack. The couple remained on the boat for approximately two years. However, Mary tired of living on the boat and at her request, Jack purchased a home on the waterfront which allowed him to moor the boat behind the marital home. Jack purchased the home for $45,000.00 using $13,500.00 of his own monies as a down payment on the home. The mortgage payments on the home are $386.00 per month which are paid solely by Jack.

¶6. When Mary arrived in the United States, she had a very poor command of the English language, and was unable to read or write. She has not held any type of job. Furthermore, she has never been to school, except for the classes she recently began taking to learn to read and write in English. While married to Jack, Mary did perform household duties such as cooking, cleaning, washing, and taking care of the yard.

¶7. Towards the end of the marriage, Mary complained of depression and sought medical attention from Dr. Roy Deal, a psychiatrist. Dr. Deal treated Mary and testified that Mary suffered from depression long before she met Jack and that she had been treated in Great Britain many years ago. Dr. Deal stated that Mary is not bi-polar, though she is being treated with Prozac, Trilafon and Lithium, a medication used to treat bi-polar patients. Mary has suicidal tendencies and has been hospitalized as a result of these tendencies. Dr. Deal testified that he thinks Mary is high risk for suicide. There was also disputed testimony regarding whether Mary suffered from an alcohol problem, gambling problem and violent behavior towards her husband and family members. Mary's medical bills total $750.00.

¶8. The parties separated on June 4, 1994. At the time of trial, Mary was sixty (60) years old, born October 4, 1935, and Jack was sixty-four (64) years old, born March 27, 1931.

¶9. Jack's income during the course of the marriage was as follows:

1988 $ 86,000.00

1989 $ 95,124.00

1990 $101,606.00

1991 $111,375.00

1992 $112,409.00

1993 $ 26,000.00 (retired)

¶10. In accordance with Exhibit 22, along with testimony presented at the hearing, Jack's monthly income at the time of trial, after mandatory withholdings, was as follows:

U.S. Coast Guard Retirement $1,374.74

Social Security Income $ 944.00

Disability Income $ 89.00

Salary (Tommy Carver) $ 525.40

IRA $ 675.00

Skandia $ 200.00

Eaton $ 123.00

Colonial $ 105.00

**TOTAL $4,037.00**

¶11. Jack indicated that he had the following assets at the time of trial:

IRA Account (A6K-801127) $238,180.00

IRA Account (Skandia 72298) $ 91,454.54

Money Market (A6K-527319) $ 5,273.00

Mutual Fund (A6K-527300) $ 560.83

Equity in marital home $ 16,000.00

Equity in boat $ 55,000.00

Navy Mutual Aid Association $ 12,126.00

**TOTAL $418,954.28**

¶12. Mary's assets were highly disputed at trial. Jack presented testimony and evidence that Mary had the following assets during the course of her marriage to Jack:

Chinese Bank $ 26.33

Hong Kong and Shanghai Bank (1) $ 42,114.27

Hong Kong and Shanghai Bank (2) $ 503.75

Sale of home in Malaysia $ 25,000.00

Land in Malaysia $135,637.00

Mahogany Trees $157,823.00

Rental House in Malaysia $ 16,000.00

2nd Rental House in Malaysia $ 17,000.00

**TOTAL $394,104.35**

¶13. Mary contended at trial that she had little money and assets. She stated that her bank accounts had been depleted at the time of trial because she had to use all of that money to live while she was in Malaysia during several extended visits. Even Jack concedes that Mary used over $55,000.00 of her own funds during the time she was married to him, a significant portion of this being withdrawn during a six month period, from September 1992 through March 1993 while she was visiting in Malaysia. She also had to pay for her mother's funeral while she was in Malaysia. In fact, after a review of Mary's three bank accounts, she had the remaining balance of only $26.33 in the Chinese Bank, $885.47 in the first Hong Kong and Shanghai Bank account (not $42,114.27 that Jack believes her to have), and $503.75 in the second Hong Kong and Shanghai Bank account at the time of their separation. The only definite income contributed by Mary during the marriage was $4,000.00 she won at the casino, which she no longer has. It was further established at trial that Mary did not contribute any of her funds towards the marital household or retirement accounts. She also admitted that Jack never spent a dime of her money.

¶14. Jack further asserts that Mary owns rental property, land and mahogany trees in Malaysia. He places a value of $135,637.00 on the land and $157,823.00 on the mahogany trees. However, these values are based on Jack's testimony alone. Furthermore, these land records were entered as exhibits and presented to the chancellor for his review and determination as to whether Mary actually owned any property. Additionally, the $33,000.00 value of the two alleged rental houses is based solely on Jack's speculation. There is no evidence in the record that these two rental houses exist or that she receives income as a result of owning this property. Furthermore, the value quoted by Jack is not an accurate reflection of his testimony:

"[t]hose houses, I think are worth about $16,000.00 or $17,000.00 total."

<u>**DISCUSSION OF THE ISSUES**</u>

¶15. The issues raised by Jack on appeal deal generally with (1) periodic alimony, (2) lump sum alimony, (3) equitable distribution of real and personal property, and (4) payment of attorneys' fees. Therefore, the issues will be considered cumulatively under four general headings.

**Standard of Review**

¶16. As this Court stated in ***Magee v. Magee***, 661 So. 2d 1117 (Miss.1995):

> Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule. ***Stevison v. Woods***, 560 So. 2d 176, 180 (Miss.1990). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." ***Bell v. Parker***, 563 So. 2d 594, 596-97 (Miss.1990). See also ***Ferguson v. Ferguson***, 639 So. 2d 921 (Miss.1994); ***Faries v. Faries***, 607 So. 2d 1204, 1208 (Miss.1992). In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." ***Newsom v. Newsom***, 557 So. 2d 511, 514 (Miss.1990). See also ***Dillon v. Dillon***, 498 So. 2d 328, 329 (Miss.1986). This is particularly true in the areas of divorce, alimony and child support. ***Tilley v. Tilley***, 610 So. 2d 348, 351 (Miss.1992); ***Nichols v. Tedder***, 547 So. 2d 766, 781 (Miss.1989). The word "manifest", as defined in this context, means "unmistakable, clear, plain, or indisputable." Black's Law Dictionary 963 (6th ed.1990).

***Magee v. Magee***, 661 So. 2d at 1122 (Miss. 1995).

**1. Periodic Alimony**

¶17. The award of periodic alimony arises from the duty of the husband to support his wife. ***McDonald v. McDonald***, 683 So. 2d 929, 931 (Miss.1996). "The husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay." ***Brennan v. Brennan***, 638 So. 2d 1320, 1324 (Miss.1994). In determining the proper amount of alimony, the chancellor should consider the Armstrong factors:

1. the income and expenses of the parties;

2. the health and earning capacities of the parties;

3. the needs of each party;

4. the obligations and assets of each party;

5. the length of the marriage;

6. the presence or absence of minor children in the home;

7. the age of the parties;

8. the standard of living of the parties, both during the marriage and at the time of the support determination;

9. the tax consequences of the spousal support order;

10. fault or misconduct;

11. wasteful dissipation of assets by either party; or

12. any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss.1993) (*citing **Hammonds v. Hammonds***, 597 So. 2d 653, 655 (Miss.1992)).

¶18. Alimony awards are within the discretion of the chancellor; this Court will not reverse an award on appeal absent manifest error or abuse of discretion. ***McEachern v. McEachern***, 605 So. 2d 809, 815 (Miss.1992); ***Cherry v. Cherry***, 593 So. 2d 13, 19 (Miss.1991); ***Powers v. Powers***, 568 So. 2d 255, 257-58 (Miss.1990). "In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion."***Armstrong***, 618 So. 2d at 1280; ***Smith v. Smith***, 607 So. 2d 122, 126 (Miss.1992).

¶19. There is sufficient evidence that Jack's monthly income was over $4,000.00. However, Mary speaks poor English and cannot write. She has not held a job since the time of her arrival in the United States. She has no income whatsoever and it appears that she has no separate estate of her own. The award of $1000.00 in periodic alimony each month appears to be justified and fair. There is no evidence that the chancellor failed to consider the proper factors, or otherwise abused his discretion. After a review of the record and briefs in this case, this Court finds no merit to this assignment of error. See ***Burkett v. State***, 484 So. 2d 1046 (Miss.1986); ***Smith v. State***, 484 So. 2d 364 (Miss.1986).

## 2. Lump Sum Alimony

¶20. "It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." ***Creekmore v. Creekmore***, 651 So. 2d 513, 517 (Miss.1995) (*citing **Cherry v. Cherry***, 593 So. 2d 13, 19 (Miss.1991)). This Court will not disturb a chancellor's decision on alimony on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error. ***Creekmore***, 651 So.2d at 517 (*citing **McNally v. McNally***, 516 So. 2d 499, 501 (Miss.1987)). In ***Cheatham v. Cheatham***, 537 So. 2d 435, 438 (Miss.1988), the following factors were considered in awarding lump-sum alimony: 1) substantial contribution to accumulation of wealth by quitting job to become housewife or assisting in husband's business; 2) long marriage; 3) separate income or separate estate meager in comparison to that of payor spouse; and 4) financial security without lump-sum alimony. Most important is a comparison of the estates. Subsequent to the decision in ***Cheatham***, this Court has consistently employed these four factors when reviewing lump-sum alimony. ***Tilley v. Tilley***, 610 So. 2d 348, 352 (Miss.1992); ***Smith v. Smith***, 607 So. 2d 122, 126 (Miss.1992); ***Cleveland v. Cleveland***, 600 So. 2d 193, 197 (Miss.1992). Disparity of the separate estates has continued to be the most compelling factor. ***Tilley***, 610 So. 2d at 352.

¶21. No findings are provided to explain the chancellor's decision for Jack to pay all medical bills up to the time of Judgment and a $750.00 expense of Dr. Dill appearing as an expert witness. These two awards are most likely categorized as lump sum alimony. However, when the four factors are applied to the present case, it is apparent that the chancellor was mindful of each party's circumstances. It is reasonable to infer

that this sum was awarded based on Mary's inability to secure a job leaving her no income other than $1,000.00 in periodic alimony, the lack of any separate estate, and was allowed in an effort to assist her getting a new start in Mississippi without any remaining debts. This Court, therefore, affirms the chancellor's award of $750.00 in medical bills.

### 3. Equitable Distribution

¶22. One of the couple's primary assets is the marital dwelling which was purchased in 1992 for $45,000.00, using $13,500.00 of Jack's money as a down payment on the home. At the time of trial, there was $16,000.00 in equity on the marital dwelling.

¶23. The chancellor ordered Jack to pay the monthly mortgage payment of $397.21, along with taxes and insurance for a period of six (6) years from the date of judgment, after which time, the marital home would be sold, with the proceeds to be divided equally between the parties. Further, Mary was awarded exclusive use and possession of the house until such time as it was sold.

¶24. Another of the couple's primary assets are the retirement accounts solely found to be in Jack's name. Jack further asserts that it was error for the chancellor to award Mary twenty-five (25%) percent of all of his retirement accounts, excluding his Coast Guard retirement. These funds total $335,370.37.

¶25. Jack asserts that Mary did not provide direct or indirect economic contribution to the acquisition of the property. He further asserts that the funds in his retirement accounts were accumulated prior to their marriage. Thus, the funds, as well as any interest on those funds, were the husband's separate estate not subject to equitable distribution. He also contends that Mary provided no contribution to the stability and harmony of the marital and family relationship as measured by quality and quantity of time spent on family duties and duration of marriage. Consequently, Jack believes the chancellor erred in ordering Jack to pay the mortgage, taxes and insurance on the marital home and then sell it at the end of six (6) years with Jack and Mary equally dividing the equity in the house and in awarding Mary twenty-five (25%) percent of his retirement accounts.

¶26. It is within the chancellor's authority to make an equitable division of all jointly acquired real and personal property. *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). In making an equitable division of marital property, however, the chancellor is not required to divide the property equally. *Love v. Love*, 687 So. 2d 1229, 1232 (Miss. 1997); *Trovato v. Trovato*, 649 So. 2d 815, 817-18 (Miss. 1995). Instead, equitable distribution is governed by the guidelines set out by this Court in *Ferguson*. These guidelines include:

> (1) economic and domestic contributions by each party to the marriage,
>
> (2) expenditures and disposal of the marital assets by each party,
>
> (3) the market value and emotional value of the marital assets,
>
> (4) the value of the nonmarital property,
>
> (5) tax, economic, contractual, and legal consequences of the distribution,
>
> (6) elimination of alimony and other future frictional contact between the parties,

(7) the income and earning capacity of each party, and

(8) any other relevant factor that should be considered in making an equitable distribution.

*Ferguson*, 639 So. 2d at 928.

¶27. Applying these factors to this case, it cannot be said that the chancellor was manifestly wrong in his distribution of the Watson's marital assets, including both real and personal property. He gave Mary a place to live for six (6) years with the mortgage paid each month and then half of the proceeds from the sale of the home. Considering the fact that Mary has no job or prospect of one, this appears reasonable. The chancellor gave Mary a share of the investments made by Jack in mutual funds and retirement accounts. However, the chancellor did not give Mary an equal share of those investments. Instead the chancellor awarded Mary only twenty-five (25%) percent of the accumulated mutual funds and retirement accounts. In *Ferguson*, this Court confirmed that the wife was entitled to a portion of her husband's retirement savings based upon her husband's economic contributions to the marriage, and because she had no separate retirement account of her own. *Ferguson*, 639 So. 2d at 933-34. Mary does not have her own retirement savings, and has no job. It is also important to note that Mary can hardly speak or write in English. The only duties she has had since Jack brought her from her homeland to the United States were duties classified as a homemaker like the wife in *Ferguson*. Although the Watsons were not married for a very long period of time, Mary did contribute to the marital relationship and is equitably entitled to some portion of the couple's personal property, marital home, mutual funds and retirement accounts. Therefore, we cannot find that the chancellor committed manifest error in his decision.

### 4. Attorney's Fees

¶28. Jack contends that the chancellor abused his discretion in awarding Mary attorney's fees in the amount of $6,000.00. Jack claims the award of this fee, under the circumstances, was an abuse of the chancellor's discretion because there was proof which established that Mary had substantial assets sufficient to pay her attorney's fees.

¶29. In *Ferguson*, this Court provided guidance in this matter:

The question of attorney's fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. *Smith v. Smith*, 614 So. 2d 394, 398 (Miss. 1993). "If a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Martin v. Martin*, 566 So. 2d 704, 707 (Miss. 1990). See also Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991) (Generally, it is true that, unless the party can establish inability to pay, attorney's fees should not be awarded by the court."). The criteria to be utilized in determining attorney's fees are found in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

*Ferguson*, 639 So. 2d at 937.

¶30. This Court is "reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award." *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988). However, considering the record as a whole, with respect to the financial position of the parties after the divorce decree, it is evident that Mary is financially able to pay for her own attorney's fees. She has been adequately awarded $1,000.00 in periodic alimony, the exclusive use and possession of the marital home, along with all mortgage payments, taxes and insurance to be paid by Jack, half of the proceeds of the sale

of the home after six years and twenty-five (25%) percent of all his retirement accounts. Under the circumstances present in this case, the award of attorney's fees was an abuse of discretion and that part of the judgment is reversed and rendered in favor of Jack.

## CONCLUSION

¶31. It is the opinion of this Court that the chancellor did not abuse his discretion in: (1) awarding Mary $1,000.00 in periodic alimony; (2) awarding Mary the payment of all medical bills and a $750.00 expert witness fee; (3) deciding that Jack would make mortgage payments, including taxes and insurance, on the marital home for six (6) years, at which time the home would be sold and the proceeds equally divided; (4) awarding Mary twenty-five (25%) percent of all mutual funds and retirement accounts. On these issues, we affirm the decision below. However, the award of $6,000.00 in attorney's fees by the chancellor was an abuse of discretion. Consequently, we reverse and render the award of attorney's fees.

¶32. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ, BANKS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., NOT PARTICIPATING.**