812 So.2d 1021 (2001)
James Ray DRUMRIGHT, Appellant,
v.
Patricia Rae DRUMRIGHT, Appellee.
No. 1999-CA-00016-COA.
Court of Appeals of Mississippi.
January 23, 2001.
*1024 Gary L. Roberts, Attorney for Appellant.
Dempsey M. Levi, Sarah E. Berry, Ocean Springs, Attorneys for Appellee.
EN BANC.
IRVING, J., for the Court:
¶ 1. The Chancery Court of Jackson County granted James and Patricia Rae Drumright a divorce on the ground of irreconcilable differences. The parties could not agree on the propriety of an award of alimony nor an equitable division of the marital assets and agreed to allow the chancellor to resolve these issues. James, feeling aggrieved by the decisions of the chancellor, has appealed and assigns as error the following issues: (1) the trial court committed manifest error and an abuse of discretion in dividing the marital assets, (2) the trial court was clearly erroneous and committed an abuse of discretion in ordering James to pay Patricia $150 per week for a period of sixty months as periodic alimony, (3) the trial court committed manifest error and an abuse of discretion in awarding Patricia $25,000 for an alleged assault, and (4) the trial court committed manifest error and an abuse of discretion in awarding attorney's fees in favor of Patricia.
¶ 2. Finding reversible error, we affirm in part, reverse and remand in part, and reverse and render in part.

FACTS
¶ 3. James and Patricia were married on February 12, 1993. They separated in November 1995, had a brief effort at reconciliation in April 1996 and were divorced on May 11, 1998, pursuant to a complaint for divorce which was filed on December 4, 1995, and tried on May 8 and October 27-28, 1997.
¶ 4. Prior to the marriage, James had purchased a lot and begun construction on a home in Ocean Springs. Patricia testified that "almost all of it" had been completed prior to the marriage. However, James and Patricia occupied the home prior to their marriage, and Patricia assumed the supervision of the interior design. Shortly after the marriage, James changed the deed on the home to include Patricia.
¶ 5. Before the marriage, Patricia was employed as an interior designer. She received a monthly income of approximately $1,000. At the time of the marriage, her assets included approximately $83,000 worth of personal property. After the marriage, and at the request of James, Patricia terminated her employment and worked within the home supervising the remaining interior design. At the time of the divorce, Patricia was employed with an annual income just over $16,000.
¶ 6. James worked as a nurse anesthetist and received a monthly income of approximately $8,000. Because he worked on a contracting basis, his salary would vary from time to time depending on the demand for his services. Often, he would go months at a time without work. Originally, James's income was submitted as $10,000 monthly; however, the proper amount of $8,000 was brought to the court's attention and accepted as such.
¶ 7. After some two and a half years of marriage, the couple began to experience some differences which led first to a separation and ultimately to the divorce. In the judgment of divorce, the chancellor found the home to be marital property and ordered it sold with the proceeds of the *1025 sale to be divided equally between the parties. The chancellor ordered James responsible for the marital debt. However, the chancellor also ordered that certain items, claimed by both James and Patricia, be sold and the proceeds applied to the marital debt. Additionally, the chancellor awarded judgment to Patricia in the amount $25,000 as compensation for injuries allegedly suffered by her in acts of domestic violence visited upon her by James. Finally, the chancellor found James responsible for all of Patricia's attorney's fees. Additional facts will be given during the discussion of the issues.

ANALYSIS OF THE ISSUES PRESENTED
¶ 8. James argues that the trial court committed manifest error and abused its discretion in dividing the marital assets. He contends that the trial court committed reversible error in ignoring his premarital interest in the home. James also contends that the chancellor erred in ordering the disputed marital property, i.e., the fixtures in the home, sold to satisfy marital debts.

I(a) Equal Division of the Proceeds from the Sale of the Marital Domicile
¶ 9. In Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994), the supreme court defined the factors to be considered as a guideline for the equitable distribution of marital property. Further, the court has outlined the steps involved in the process of applying the equitable distribution factors listed in Ferguson. Id. at 929. First, the chancellor is to classify the parties' assets as marital or non-marital based on the Mississippi Supreme Court's decision in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994). Second, the chancellor is to value and equitably divide the marital property, employing the Ferguson factors as guidelines, in light of each party's non-marital property. However, "[p]roperty division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." Ferguson, 639 So.2d at 929. Third, if the marital assets, after equitable division and in light of the parties' non-marital assets, will adequately provide for both parties, then "no more need be done." Finally, if an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony should be considered. Kilpatrick v. Kilpatrick, 732 So.2d 876(¶ 16) (Miss.1999).
¶ 10. Under the first step, marital property can be defined as that which was acquired during the course of the marriage. Waring v. Waring, 747 So.2d 252, 255 (Miss.1999). Also, property brought into the marriage by one partner and used by the family becomes a marital asset, losing its identity as a separate estate. Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss.1994).
¶ 11. This Court will not overturn the trial court's ruling unless it finds it to be manifestly wrong, clearly erroneous, or that an improper legal standard was employed. Arthur v. Arthur, 691 So.2d 997, 1001 (Miss.1997). Absent a finding of one of these circumstances, we are compelled to affirm the chancellor's finding.
¶ 12. In the case sub judice, the home was occupied by both James and Patricia, and both of their names were included on the deed. Even though James owned a major premarital interest in the home, once Patricia moved into the home following the marriage, she gained an equitable interest. Additionally, James changed the deed to include Patricia which resulted in Patricia having a legal interest in the home. It is undisputed that the *1026 home was the marital domicile of the parties.
¶ 13. It also is undisputed that the home was near completion prior to the marriage. Patricia testified that "almost all of it" was completed, and James testified that 95% of it was finished. The testimony was that James did most of the construction work himself and that the market value of the home after completion was substantial. James testified that he believed the value of the home upon completion was around $199,000, and Patricia testified that she had been told by a real estate agent that the house would list anywhere between $250,000 and $275,000. The lot on which the home was built was acquired by James prior to the marriage at a cost of $45,000. There was an outstanding premarital construction loan in the amount of $70,000. After the parties were married, they acquired a second mortgage on the home for around $20,000 and refinanced the entire indebtedness. As stated, the chancellor ordered the home sold and the proceeds divided equally between the parties.
¶ 14. It is well-settled law that the courts, when making an equitable distribution of marital property, are not required to divide the property equally. Love v. Love, 687 So.2d 1229, 1232 (Miss.1997). We agree with the chancellor that the home became marital property and thus a part of the marital estate to be equitably divided. However, due the unique and specific facts of this case, we do not believe an equitable distribution of the marital estate can be accomplished without James being given some credit and consideration for the value of that which he had acquired exclusively before the marriage.
¶ 15. Though commingled property is included in the marital estate, that fact does not and should not prevent the court, as a part of the equitable division analysis, from giving due consideration to the pre-commingled value of the commingled asset, nor does it mean that the party who brought the asset into the marriage should be given credit in the exact percentage of ownership that existed before the asset became commingled.
¶ 16. Further, we point out that the conveyance from James making Patricia a joint owner of the property did not mandate that she be given half the value of the home as a part of the equitable division. On the other hand, the fact that the home was approximately ninety-five percent complete when the parties married does not mean that Patricia could never be entitled to a fifty percent interest in an equitable division of the marital estate. What the court must look to is the relative contribution of parties to the marital estate. In our judgment, therein lies the problem with what the chancellor did. Because of the short duration of this marriage and no financial or other contribution by Patricia to ninety-five percent completion of the home, it is difficult to see how Patricia could acquire an equitable claim to fifty percent of the value of the home.
¶ 17. As stated, property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. The chancellor, however, made no evaluation of the assets. Additionally, in Ferguson the Mississippi Supreme Court directed chancellors to make specific findings of fact. The chancellor did not do that here, and in the absence of specific findings of facts and conclusions of law by the chancellor, we cannot say that the chancellor did not abuse his discretion in the division of the proceeds from the home, and we reverse and remand this matter for further consideration. This reversal should not be interpreted *1027 to mean that we are holding that Patricia's in-home contributions do not count, nor are we implying that they could never entitle her to an equal division of the value of the marital domicile in an equitable division of the marital estate. They certainly do count and could at some point arise to that level of entitlement. The problem here is that there has been little time for those contributions to garner such weight.

1(b) Division and Sale of Personal Property
¶ 18. Each of the parties submitted lists of personal items which each claimed to be premarital assets. The chancellor awarded James all of the items on James's list except the ones which the chancellor concluded were a part of the realty and four items which the chancellor awarded to Patricia. The items which the chancellor concluded were a part of the realty were the garage door opener, cooktop, dishwasher, refrigerator, vacuum system and wall oven/microwave. The four items awarded to Patricia from James's list were three pieces of art work and a gold plated place setting for eight. The purchase price of these four items was listed as $3,300, but no value was given as of the date of distribution. The remaining personal property in the marital domicile, except items showing a purchase price of approximately $20,000, was ordered sold and the proceeds applied to the marital debt. The excepted items were awarded to Patricia, and again, no value was placed on these items as of the date of distribution. As far as we can tell from the record, James was not given any of the disputed or undisputed household property comprising the marital estate.
¶ 19. We are unable to ascertain from the record whether the chancellor valued the marital estate as required by Ferguson. There is some evidence as to the acquisition cost of the household items, including those given to Patricia, but there is no evidence, so far as we can tell, as to the value of those items at the time of the divorce. However, since all of the marital household property, not given to Patricia, was ordered sold and the proceeds applied to the marital debt, we believe the chancellor operated within permissible limits. We arrive at this conclusion because we are convinced that, given the vast difference in the parties' income and income earning potential, the chancellor would have operated within the proper range of his discretion had he ordered the items divided equally and ordered James responsible for all of the marital debt. Since most of the items were ordered sold and the proceeds applied to the marital debt, we see no net harm to James. Accordingly, we affirm the chancellor in this regard.

II. The Alimony Award
¶ 20. James contends that the chancellor erred in awarding Patricia periodic alimony in the amount of $150 per week for sixty months. He contends that financial indiscretions committed by Patricia during the marriage brings into question the propriety of granting alimony in any form or amount.
¶ 21. Alimony awards are largely at the discretion of the trial judge. A chancellor's decision regarding the amount and type of alimony will be upheld on appeal unless the decision is found to be manifestly in error either in fact or law, or otherwise an abuse of discretion. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993).
¶ 22. Under Mississippi law, the chancellor must consider the following factors when making alimony determinations:

*1028 1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.
Armstrong, 618 So.2d at 1280.
¶ 23. There are three different categories of alimonyperiodic, rehabilitative, and lump sum. Hubbard v. Hubbard, 656 So.2d 124, 129-30 (Miss. 1995). "Rehabilitative periodic alimony is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim." Id. at 130. It is subject to modification and has a time limit set by the court. Periodic alimony does not have a termination date and continues until the death of either spouse, the remarriage of the recipient, or further order of the court based on a change in circumstances. Id. at 129. Lump sum alimony differs in that it is a final settlement, not subject to modification. It is sometimes referred to as alimony in gross. Id. When determining which type of alimony has been awarded we look to the substance of what has been provided, and not the label. Bowe v. Bowe, 557 So.2d 793, 795 (Miss.1990). We inquire not what the court entering the prior judgment meant but what the judgment means. Id.
¶ 24. Here the alimony awarded has a time limitation attached and appears to be for the purpose of rehabilitating Patricia, allowing her to become self-supporting. The chancellor, in his judgment, seems to be reasoning that the amount of James's income, along with the disparity between the incomes of James and Patricia, validates the award which will enable Patricia to rehabilitate herself in order to maintain the standard of living she has become accustomed to or somewhere near it. Accordingly, we affirm the award of alimony as rehabilitative periodic alimony rather than periodic alimony as stated in the judgment.

III. Damages for Personal Injury
¶ 25. The chancellor awarded Patricia $25,000 in damages for injuries inflicted upon her by James during the course of the marriage. James argues that the evidence presented was wholly insufficient to support the award.
¶ 26. Before addressing the merits of this issue, we point out that a claim for personal injury arising out of an assault and battery properly belongs in the circuit court. However, in this case, the parties submitted the personal injury damage claim to the chancellor as one of the issues for resolution in this irreconcilable divorce. We now turn to the merits of this issue.
*1029 ¶ 27. A party must prove that he or she is entitled to damages to a reasonable certainty. An award cannot be based on speculation and conjecture. Flight Line, Inc. v. Tanksley, 608 So.2d 1149, 1164 (Miss.1992). However, "[w]here the existence of damages has been established, a plaintiff will not be denied the damages awarded by a fact finder merely because a measure of speculation and conjecture is required in determining the amount of the damages." TXG Intrastate Pipeline Co. v. Grosnsickle, 716 So.2d 991(¶ 86) (Miss. 1997).
¶ 28. In the case at bar, Patricia testified of being assaulted by James on two occasions, one time in May 1994 and again on September 15, 1996. Patricia testified that in the May 1994 incident, she tried to prevent James from leaving the house because he had been drinking a lot. She stood in front of the doorway, but James knocked her away, and she fell and hit the back of her head and neck on the tile. She testified that she had to have surgery in August 1994 as a result of the injuries she had received in the assault. In the September 15 incident, James knocked her down. She was transported by ambulance to the hospital where she was treated and released. She was given two shots and a prescription upon being released. There were no medical reports or testimony from any physician or medical experts detailing Patricia's injuries.
¶ 29. A two-page itemization of medical bills with attachments was offered and admitted into evidence over James's objection that they had not been authenticated and that no showing had been made that they were reasonable or necessary in conjunction with the September 15 incident. This was the only medical evidence admitted in this case. Prior to the admission of the itemization of medical bills, Patricia testified that the medical bills reflected on the itemization were the result of the September 15 incident. On cross-examination, the following dialogue occurred between Patricia and James's counsel:
Q. None of this itemization has anything to do with that incident of September 15th, 1996 does it?
A. No, sir. Only to the extent the medical coverage was not continued.[1]
Q. Okay. Now, the next page itemization has nothing to do with that incident, does it?
A. No, sir. Only the history of the medical coverage.
Q. Okay. The next page still has nothing to do with, because the last item there is August 5th of '96 before the incident that you complained of on September 15th of '96; is that correct?
A. That's correct. Same reason.
¶ 30. In the judgment rendered by the chancellor, only the September 15 incident is discussed. Not even a reference is made to the May 1994 incident. The testimony offered by Patricia failed to provide a nexus between the September 15, 1996 incident and the damages she claimed as being supported by the itemization of medical bills. First, the prescription drugs described in her exhibit of the medical bills were prescribed for her prior to the incident. Second, the bill for medical treatment provided in December of 1996 did not indicate vital information such as the type of treatment, the diagnosis, the extent of injury, or the reason for the treatment. In fact, her testimony was that she had not yet undergone any surgery as a result of the September 15 incident.
*1030 ¶ 31. Without expert medical testimony explaining the treatment, the Court has no means of determining if the treatment rendered was reasonably necessary or even related to the incident. The only testimony directly referring to the incident indicated that on the night of the incident Patricia was taken to the Ocean Springs Hospital where she was treated and released. As stated, and shown by the above colloquy, nothing in the itemization of medical bills related specifically to the September 15 incident. That conclusion is buttressed even further by this exchange:
Q. The first items on the summary there is not a itemized expenditure there from November 15th of '96. This is all things that occurred since then, right?
A. November?
Q. Excuse me, September 15, '96.
A. With the exception of, yeah they all have.
Q. And this is medication, right?
A. Yes, sir.
Q. And it is all medication that you had been taking before?
A. Only when I had been injured before.
Q. Okay, Same thing true with K & B. The second block of things itemized in Exhibit 13; isn't that correct?
A. That's correct.
Q. All right. Now, the $211 is the Amserve bill?
A. Yes, sir.
Q. That you say is what is left after the insurance paid the rest?
A. Yes, sir.
Q. Okay. The $1,534 is that the bill from Singing River Hospital when they checked you out and gave you two shots.
A. No, sir, this is the bill from Singing River Hospital when I had the myelogram.
* * * * * *
Q. That is when you went finally and got a myelogram?
A. Yes, sir.
Q. More than three months after the incident of September 15th?
A. Yes, sir.
Q. Okay.
A. Because first we started with a CAT scan and then we sequed [sic] into an MRI and then we went to a myelogram.
Q. And Gulf Coast Radiology Group do you see that?
A. Yes, sir.
Q. $523?
A. Yes, sir.
Q. When was that service rendered?
A. That service was rendered 12-30.
Q. December 30th, more than three months after that incident on December 15th [sic]?
A. Correct. But that was post other procedures.
Q. All right. And then the Heart Center?
A. Yes, sir.
Q. And did I understand you to say earlier that that's not related to the incident of September 15th?
A. That's correct.
¶ 32. While it is clear that the medical information, which was the subject of the colloquies between counsel and Drumwright, did not relate to the September 15 incident, we are unable to determine whether some of it may have related to the May incident. We note that when she was asked if it was all medication she had been taking before [meaning the September 15 *1031 incident], her response was, "[o]nly when I had been injured before." There was no explanation whether she was referring to the May injury or another unrelated to James.
¶ 33. Due to the absence of specific expert medical evidence detailing the damages Patricia suffered, as well as the absence of expert testimony that the treatment provided was reasonable and necessary medical treatment for injuries received at the hands of James during one or both of the attacks, we reach the inevitable conclusion that Patricia failed to present proof sufficient to support an award of $25,000. This fact becomes even more evident in light of the fact that the chancellor also said in his judgment that the $25,000 awarded for personal injury included a lump sum amount for future medicals. There was no expert medical testimony that Patricia was likely to incur future medical expenses as a result of the two assaults by James. Patricia had five surgeries prior to marrying James. The record is silent as to whether she was still incurring medical costs relating to any of those procedures. However, there is simply no evidence in the record which would support an award for future medicals arising out of any injury caused her by James.
¶ 34. Having determined that Patricia failed to present sufficient evidence to support the specific amount of the personal injury award, at first blush it would appear that we should reverse and render on this issue. However, it is clear that she suffered injury on two occasions at the hands of James. Her testimony is uncontradicted that the May 1994 incident necessitated surgery in August 1994. James denied assaulting Patricia in the September 15 incident. He was charged criminally and pleaded not guilty but was found guilty of domestic violence in this incident. The chancellor heard James's version and Patricia's and accepted Patricia's, which he was entitled to do.
¶ 35. As stated, Patricia clearly established that she had been injured by James, yet she failed to produce any evidence as to the extent of her injuries, and the treatment and diagnosis regarding them. It is unclear whether any of the medical information or bills that were present related to the May 1994 injury. Under these circumstances, we believe the proper course is to reverse and render that undetermined portion of the award that was for future medicals and remand this issue to the chancellor with directions that he reconsider the award. Upon remand, however, Patricia shall not be allowed to supplement the record with respect to any medical expenses which might be offered or medical reports detailing the treatment, diagnosis or prognosis resulting from either of the incidents. To allow such supplementation would, in our opinion, give Patricia two bites at the apple. No such evidence was produced in the initial trial, and she should not be allowed to correct this deficiency on remand. However, she should not be prevented from giving testimony concerning the medical bills about which she testified during the first trial.

IV. Attorney's Fees
¶ 36. The award of attorney's fees in a divorce case is left to the discretion of the trial court. Hemsley, 639 So.2d at 915. The party seeking attorney's fees is charged with the burden of proving inability to pay. Jones v. Starr, 586 So.2d 788, 792 (Miss.1991). Normally, if the party is able to pay his or her own attorney's fees an award of such fees is inappropriate. Id. However, in Hemsley, the court allowed an award of attorney's fees even though the requesting party could pay her own because to do so would render her "barely [able to] cover her monthly expenses;" *1032 thus, creating an unreasonable burden. See Hemsley, 639 So.2d at 915.
¶ 37. Here the amount of Patricia's income along with the vast disparity in the incomes of James and Patricia call for an award of attorney's fees in favor of Patricia. However, the award should be limited to the charges for time spent on issues on which she prevailed. Accordingly, we affirm Patricia's entitlement to attorney's fees but reverse and remand the amount to be awarded consistent with this opinion.
¶ 38. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED AS TO THE AWARD OF ALIMONY BUT MODIFIED TO MAKE THE AWARD REHABILITATIVE PERIODIC ALIMONY INSTEAD OF PERIODIC; THE JUDGMENT AS TO THE DIVISION OF THE PERSONAL PROPERTY OF THE MARITAL ESTATE IS AFFIRMED BUT REVERSED AND REMANDED AS TO THE DIVISION OF THE MARITAL HOME; THE JUDGMENT AS TO THE AWARD OF $25,000 FOR PERSONAL INJURY IS REVERSED AND REMANDED, AND THE JUDGMENT OF AWARD OF ATTORNEY'S FEES IS AFFIRMED AS TO THE APPELLEE'S ENTITLEMENT BUT REVERSED AND REMANDED AS TO THE AMOUNT. COSTS OF THIS APPEAL ARE ASSESSED THREE FOURTHS TO APPELLANT AND ONE FOURTH TO APPELLEE.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, THOMAS, and CHANDLER, JJ., concur, PAYNE, J., concurs in part and dissents in part. LEE and MYERS, JJ., not participating.
PAYNE, J., concurring in part, dissenting in part:
¶ 39. This is a divorce from a marriage plagued with domestic violence against the wife and followed by orders to sell most of the marital personal property to pay off marital debts. The majority complains that there was no overall evaluation of the property and remands the case to establish value. Since the goods were ordered to be sold, it would appear that on remand the chancellor will know the actual market value and not just appraisals. There can be no reshuffling of items, only reworking of balance sheet figures. There can be no refunds from creditors should the chancellor on remand decide that because of disparate incomes the wife's share should not have been applied to the marital debts. In short, we cannot "unscramble this egg."
¶ 40. While I respect the opinions of my colleagues, I take great issue with the majority's resolution of certain issues in this case, specifically concerning division of the marital home and concerning the issue of future damages related to Patricia's personal injury and the refusal to allow further testimony from Patricia on remand concerning medical expenses.
¶ 41. First, concerning division of the marital home, I agree with the majority that when James and Patricia married, the home became marital property. Even though James owned a major interest in the home prior to the marriage, once Patricia moved into the home following the marriage, she gained an equitable interest. Additionally, the majority recognized that James added Patricia's name to the deed to give her a legal interest in the home, and that the home was commingled property once James and Patricia married and used it as the marital home. The majority's language with which I take particular issue is this: "though commingled property is included in the marital estate, that *1033 fact does not and should not prevent the court, as a part of the equitable division analysis, from giving due consideration to the pre-commingled value of the commingled asset, nor does it mean that the party who brought the asset into the marriage should be given credit in the exact percentage of ownership that existed before the asset became commingled." I do not agree that such pre-marriage valuation should be considered, nor should either party's pre-marital ownership interest in the home be a consideration. As I interpret the law, once property becomes marital property, any pre-marriage characteristics of the property should have no bearing on the chancellor's distribution of the property. Here, the fact that, at the time of the marriage, James owned the primary interest in the home should have no bearing on the chancellor's equitable distribution since James signed over one-half of his interest to Patricia the week after they were married and because the couple used the house as their marital domicile. Thus, I agree that the home became marital property subject to equitable distribution. However, since it was divided equallya result that would have been true had there been a partition suitI see no need to remand for evidence as to value. This fifty-fifty divisionregardless of the dollar figurewould not alter the parties' standing in regard to division of the remaining property and debts.
¶ 42. In Franks v. Franks, 759 So.2d 1164 (Miss.1999), the husband, Larry Franks, argued on appeal that the court erred in awarding the marital home, which he brought into the marriage, to the wife. Larry argued, "since the chancellor found that the `marital residence was purchased by Larry Franks prior to the marriage, he made all payments on the residence and it was finally paid in full approximately one year after the parties married,' the residence should have been classified as non-marital property." Franks at (¶ 18). The supreme court disagreed with Larry's reasoning and affirmed the chancellor's awarding the home to the wife, saying such award was necessary to provide an overall equitable distribution of the marital assets.
¶ 43. In Franks, the court failed to cite any rule which would have rendered the marital home once again a non-marital asset, as the home only belonged to Larry Franks prior to the marriage. In the present case, the majority has also declined to render the marital home, which it has unequivocally said was a marital asset, back to its pre-marriage status in James's sole ownership. As in Franks, the chancellor here also attempted to divide the entire marital estate in an equitable manner. This included, among other things, ordering that certain marital assets be sold to pay debts accrued during the marriage, including the marital home which the chancellor ordered to be sold and the proceeds divided equally between James and Patricia. I have found no other cases directing that we follow a course of action in a situation such as this where one spouse has brought his or her own house into the marriage, used it as the marital domicile, then upon divorce the court re-classified the home as a non-marital asset, returning it to the spouse who owned it prior to the marriage. I believe the law clearly describes the rules we are to follow:
Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' estates prior to the marriage or outside the marriage....
However, "non-marital assets ... may be converted to marital assets if they are commingled with marital assets or used for familial purposes." "Commingled *1034 property is a combination of marital and non-marital property which loses its status as non-marital property as a result."...
Further, the supreme court has held "[w]hen an individual commingles non-marital assets with joint marital assets, the non-marital assets are converted into marital assets, subject to an equitable distribution unless subject to an agreement to the contrary."
Parsons v. Parsons, 741 So.2d 302 (¶¶ 25-26, 28) (Miss.Ct.App.1999) (citations omitted). In Parsons, the chancellor found that the house the wife brought into the marriage was a non-marital asset. However, the house was later sold during the marriage and the proceeds were used to buy another marital home. This Court said that using proceeds from the sale of the home to buy the new marital home effectively commingled the properties, rendering it marital property to be equitably divided.
¶ 44. In Heigle v. Heigle, 654 So.2d 895 (Miss.1995), the supreme court found that the wife's donation of a $10,000 inheritance, which she received from a relative, into her husband's business effectively acted to commingle the asset, rendering it a marital asset.
[N]onmarital assets (e.g. inherited property) may be converted to marital assets if they are commingled with marital assets or used for familial purposes. Such converted assets are then subject to equitable distribution. In the instant case, the $10,000 which JoAnn inherited was placed in an account which the couple used to purchase cattle, and to pay other family expenses. Consequently, these funds lost their status as nonmarital property, were converted to marital property, and should have been treated as such.
Heigle, 654 So.2d at 897. See also Johnson v. Johnson, 650 So.2d 1281 (Miss.1994) (wife allowed proceeds from some of her inherited assets to benefit the entire family; the court said this commingling caused such assets to lose their nonmarital character, rendering them subject to equitable distribution since there existed no agreement to the contrary).
¶ 45. I find no authoritative provision which states that if the couple divorces, previously owned property may once again take on a non-marital characteristic for equitable distribution purposes. Also, I do not find any authority which allows us to take away now-marital property and switch it back to non-marital property simply because one spouse brought a substantial portion of the asset into the marriage. Though the majority opinion states that the home was a marital asset subject to equitable distribution, it has suggested that this issue be remanded for further consideration. However, looking to the discrepancies between the financial situations of James and Patricia, I see no reason for us to remand with instructions that the chancellor reevaluate his ruling on this issue, as I find the chancellor did not abuse his discretion in opting to order that the home be sold and the proceeds be divided equally.
¶ 46. The majority states that the first step in an equitable distribution analysis is to classify the parties' assets as marital or non-marital, according to the Hemsley guidelines. Next, the Ferguson factors should be employed to equitably distribute the marital property. This is the step I believe the majority has declined to fully examine. The Ferguson factors are as follows:
(1) economic and domestic contributions by each party to the marriage,
(2) expenditures and disposal of the marital assets by each party,

*1035 (3) the market value and emotional value of the marital assets,
(4) the value of the nonmarital property,
(5) tax, economic, contractual, and legal consequences of the distribution,
(6) elimination of alimony and other future frictional contact between the parties,
(7) the income and earning capacity of each party, and
(8) any other relevant factor that should be considered in making an equitable distribution.
Wolfe v. Wolfe, 766 So.2d 123 (¶ 7) (Miss. Ct.App.2000) Citing Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). In the majority's objection to the chancellor's decision to split proceeds from sale of the house equally between James and Patricia, I fear they have not conducted a full analysis against the above factors. The majority states that, due to the short duration of the marriage, too little time has passed to apply much weight to Patricia's contributions as would qualify her for a substantial ownership interest in the home. I disagree. Concerning Patricia's contributions, I would first call attention to the fact that James requested that Patricia stay home after they were married, which she did. Previously, she had worked as a missionary in Central America and had worked in the field of interior design, selling carpet and wall covering. For nearly the first year and a half of her marriage, Patricia stayed home at James's request. She only went back to work full time in January 1996 after the couple had separated. When Patricia and James married, the home was not yet complete, and Patricia testified that she helped to complete the decorations on the new home. Patricia testified that while James went to work, she was completing not only exterior portions, but was responsible for all of the flooring, all of the paint, and all of the fabrics for the interior of the home. Also of significance is the fact that, along with James, Patricia also signed the note at the house closing and signed the refinancing agreement for the house. Further, in early 1996 when James and Patricia separated, a catastrophe hit the house. During a cold spell, the pipes in the house froze and burst and the heat exchange pump unit in the attic almost exploded. Water thereafter ran through the house for three days which caused over $100,000 worth of damage. Jim was not immediately available to deal with this disaster, so Patricia had to meet with the contractor, the insurance company, the insurance adjuster, the movers and the antiques dealers to begin the salvage and restoration process. Essentially, Patricia ended up supervising the rebuilding and redecorating of the house.
¶ 47. Looking to the major role that Patricia played in stabilizing, caring for, and maintaining the marital home, I cannot understand how the majority finds that she is entitled to less that half an interest in the home, simply because the construction of the home was primarily complete at the time of the marriage. I fear that the majority has failed to consider the first of the Ferguson factors listed above concerning an evaluation of the economic and domestic contributions by each party to the marriage. The majority states they are not holding that Patricia's in-home contributions do not count, nor are they saying such contributions could never entitle her to an equal division of the value of the marital domicile in an equitable division of the marital estate. The majority does, however, state that Patricia's could "at some point arise to that level of entitlement" in the future, since, at the present, there has been little time for those contributions to garner such weight. I strongly disagree with this failure to recognize that Patricia indeed has made substantial contribution, *1036 both economically and domestically, during the short duration of her marriage.
¶ 48. The majority also wishes to make an issue the fact that the marriage was of a relatively short duration, which also works against Patricia's interest. I would call attention to the cases I previously cited which regard commingling of assets. The majority states, "because of the short duration of this marriage and no financial or other contribution by Patricia to ninety-five percent completion of the home, it is difficult to see how Patricia could acquire an equitable claim to fifty percent of the value of the home." Again, I would submit that the length of the marriage as well as the pre-ownership interest prior to the marriage should have no bearing on the chancellor's decision to equitably divide the interest in the home, since it was commingled upon the marriage, both by its becoming the marital domicile and by James's and Patricia's names both being put on the deed and on financing papers relating to the home. A clear intent was manifest to make this home the joint possession of both Patricia and James, and absent an agreement to the contrary this home should have been equitably divided as I have described herein.
¶ 49. I would call attention to the case of Watson v. Watson, 724 So.2d 350 (Miss. 1998) which was similar to the Drumrights's case in several aspects. In Watson, John and Mary Watson were married in 1988 and separated six years later. During this time, John worked while Mary remained a homemaker. The marital home was purchased in 1992 for $45,000 with Jack paying a $13,500 down payment from his own monies. Thereafter, Jack also paid the monthly mortgage payments. During the marriage, Mary never worked outside of the home, but did perform household duties such as cooking, cleaning, washing, and taking care of the yard. Id. at (¶ 6) In the divorce order, the chancellor found that Mary had little money and assets, had not worked during the marriage, and that she had no job or prospect of one. Accordingly, he ordered Jack to continue paying the mortgage for six years from the date of judgment, after which time the marital home would be sold and the proceeds divided equally between the parties. Watson at (¶ 23) On appeal, Jack argued that Mary did not provide direct or indirect economic contribution to the acquisition of the property, nor did she contribute to the stability and harmony of the marital and family relationship. The chancellor disagreed saying that although the Watsons were married for a relatively short period of time, Mary did contribute to the marital relationship and is equitably entitled to some portion of the couple's property, including the marital home. Id. at (¶ 27). I find this ruling authoritative to the Drumrights's situation. As the Watson court found that, although the marriage was for a short duration, Mary's domestic contributions were substantial as to entitle her to a one-half interest in the marital home, I would find that Patricia's contributions, which go even beyond those of homemaker and encompass her professional decorating services, would work in her favor as the chancellor considers equitable distribution of the marital home.
¶ 50. Additionally, another of the questions to be considered in equitable distribution is the length of the marriage. However, where the husband's domestic violence against the wife brought about the shortness of the marriage, I certainly do not believe that element should favor the husband. Here, it appears we have done just this, and I cannot agree with such action.
¶ 51. In its opinion, the majority states that reversal and remand is required because *1037 the chancellor failed to make specific findings of fact and conclusions of law and that he did not make valuations of the fair market value of the assets, consequently abusing his discretion. While it is true that the chancellor did not compile a document formally entitled, "findings of fact and conclusions of law," his opinion did thoroughly detail the facts of this case and incorporate as exhibits to his opinion an inventory that James and Patricia had made during their marriage of all their assets and the cost of each item. Additionally, the opinion discussed in detail the Hemsley factors relating to alimony and the Ferguson factors relating to equitable distribution as they applied to this case. Further, the chancellor's intent in drafting his twelve-page judgment, not including the nine pages of exhibits, proves that this document was meant to be a final conclusion as the section on attorney's fee concluded by stating, "The Court finds that James Drumright shall be responsible for payment of all of the Plaintiffs attorney fees, which includes the additional hours spent in preparation of this proposed Findings of Fact and Conclusions of Law and Judgment of the Court."
¶ 52. For the reasons set forth above, on the matter of equitable distribution I fear that in the majority opinion's attempt to do equity, it is acting conversely to the established principles we have heretofore been assigned, substituting its findings for that of the chancellor without finding abuse of discretion. Thus, I dissent to the majority's treatment of this issue.
¶ 53. Second, I must dissent to the majority opinion's decision to reverse and render on the issue of Patricia's future medical expenses related to the incidents of abuse she suffered at James's hands. I also disagree with the majority's declination to permit further testimony on remand concerning Patricia's medical expenses. As pointed out, this is generally an issue for a circuit court, but since the parties agreed, the chancellor was allowed to hear this issue.
¶ 54. As described before, though I disagree, I recognize that the majority has decided to remand for consideration the issue of evaluation of the property as it concerns equitable division of the marital home. With its having done so, the majority has directed that the chancellor review further evidence concerning James's premarital contributions to the establishment of the home, Patricia's post-marriage contributions, and an accurate evaluation of the property at the time of the trial. In this same vein, since we are remanding to allow new testimony on the issue of valuation of the marital property, for the following reasons I believe we should require that a new trial on remand be conducted on the damages issue as a whole.
¶ 55. I cannot agree with the majority's treatment of Patricia's personal injury action against James and with their decision to disallow further testimony. The majority states that the two-page itemization of medical bills with attachments was the only medical evidence admitted in this case. I would remind the majority that Patricia convincingly testified concerning her need for surgery, her trip by ambulance to the hospital the evening of September 15, 1996 when James pushed her to the floor, and concerning her ongoing pain and suffering related to James's abuse. The majority states that Patricia's testimony is "uncontradicted that the May 1994 incident necessitated surgery in August 1994." Also, the majority acknowledges that James was found guilty of domestic violence concerning the September 1996 incident. These findings, along with Patricia's corroborative testimony, I believe put forth ample evidence as would require that further evidence, including expert medical *1038 testimony, be allowed on remand concerning the damages issue.
¶ 56. I recognize that the majority found Patricia's presentation of evidence concerning her injuries and medical bills lacking; however, I do not agree that she should be prohibited on remand from presenting further evidence. Patricia testified that she endures pain and suffering daily stemming from James's past abusive behavior towards her. Additionally, the record is replete with evidence of Patricia's continuous pain, and also contains copies of drug prescriptions Patricia had filled to control such pain resulting from the September 15, 1996 incident. At the very least, the chancellor needs to hear medical testimony on these matters which addresses reasonable medical services and charges that Patricia incurred between the time of trial but prior to hearing on remand. Having said this, I would reverse with instructions that a new trial be conducted regarding all damages.
¶ 57. Looking to other tort issues concerning personal injury, each suit for personal injury must be decided by the facts shown in that particular case. The amount of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and health of the injured plaintiff, are all variables to be considered by the jury in determining the amount of damages to be awarded. Woods v. Nichols, 416 So.2d 659, 671 (Miss.1982). See also General Motors Corp. v. Pegues, 738 So.2d 746(¶ 24) (Miss.Ct.App.1999). In the present case, the chancellor was not privy to all of this information. Since James was unequivocally shown to be liable for Patricia's injuries on the two dates at issue, May of 1994 and September of 1996, the chancellor should have been presented with medical testimony and clear information concerning Patricia's "amount of physical injury, mental and physical pain, present and future, temporary and permanent disability, [and] medical expenses." Woods, 416 So.2d at 671. By suggesting that Patricia or her designated expert be allowed to present the chancellor with further evidence relating to her medical injuries, past and future, stemming from the violent incidents suffered at the hands of her husband, I am not proposing giving her another "bite at the apple." Rather, I find that her "one bite" before the chancellor merely concerned liability; on remand, her new "bite" should concern the matter of damages and should include relevant medical testimony describing Patricia's medical bills as well as pain and suffering.
¶ 58. The evidence presented showed Patricia had to undergo surgery due to the May 1994 incident where James pushed her to the ground, which injured her head and neck. In fact, the majority opinion states, "Patricia clearly established that she had been injured by James." However, the majority goes on to conclude that, although Patricia was unequivocally injured, since she failed to present a clear record of evidence concerning medical bills and diagnoses, she is not entitled to receive damages for these undisputed injuries. I do not see the point of remanding to the chancellor with direction that he reconsider the award if he is allowed only to review the same evidence that he reviewed the first time around. Rather, since liability has been shown, I think it is only fair and equitable to require a new trial on remand on the issue of damages alone. This would enable the chancellor to hear evidence from an expert or from Patricia's treating physicians and would enable the chancellor to make an informed decision concerning a damage award for the pain and suffering that Patricia has and will incur in the future due to James's past inflictions of abuse.
*1039 ¶ 59. As the majority correctly cited, an award for personal injury cannot be based on speculation or conjecture; however, where the injured shows he suffers damages, he will not be precluded from receiving a damages award merely because some amount of speculation must be used in calculating the amount of those damages. TXG Intrastate Pipeline Co., 716 So.2d 991 at (¶ 86). In McFadden v. United States Fidelity and Guaranty Co., 766 So.2d 20 (Miss.Ct.App.2000), this Court found that the appellant's proof of damages was based on "the rankest speculation and conjecture" and, thus, such evidence was not allowed to go the jury for a consideration of a damages award. McFadden, 766 So.2d 20 at (¶ 10). In McFadden, the doctor failed to present any evidence concerning damages he suffered due to slanderous remarks made against him. Loss of income was a necessary element to establish liability. In this case, the liability question does not depend on amount of damages.
¶ 60. The majority says there is no evidence to support an award for future medicals arising out of any injury caused to Patricia by James, yet affirms that "it is clear that she suffered injury on two occasions at the hands of James." The chancellor heard evidence which proved James's unequivocal liability for injuring Patricia. On remand, then, I would recommend that the chancellor hold a new trial to allow further evidence to be presented concerning damages. Simply allowing Patricia to testify again concerning the same evidence which was presented at the initial trial would, in all likelihood, not further enlighten the court to the extent necessary to reach an adequate amount of damages due Patricia. In fact, I believe equity requires the court to allow Patricia to provide further evidence, if available, since the chancellor must seek to arrive at the most accurate sum concerning damages. To attempt to make such award, as he did before, without complete information effectively acts to cheat either Patricia or James, since both have an interest in seeing equity done in their cases.
¶ 61. Having stated my reasons for dissent, I would lastly point out that I concur with the majority on the award of rehabilitative alimony and agree that the chancellor should be affirmed in that regard.
¶ 62. Since Patricia prevailed on the chancellor's finding of the home as marital property, the sale of personalty to pay debts which James could easily have been required to pay from his own pocket, and on James's liability for two separate injuries, May, 1994 and September 15, 1996, I would hold that Patricia is entitled to her full attorney's fees as what was left was only recalculations of dollars in damages. Therefore, I dissent to all matters except to those mentioned in the above paragraph.
NOTES
[1] This was an apparent reference to a temporary order requiring James to keep medical coverage on Patricia and, according to her, he had not done so.