¶ 1. After thirty years of marriage, Joyce and Joseph (Joe) Parsons were granted a divorce on the ground of irreconcilable differences. The only issue presented to the chancellor for decision was the division of marital assets. Aggrieved by the chancellor's ruling that the house located at 528 Mayer Street in Greenville was a non-marital asset, Joe appeals. Finding no merit to the issue raised, we affirm.
 FACTS
¶ 2. Joyce and Joe Parsons were married on July 20, 1966. Joyce was 38 years old and Joe was 39. Each had children from a previous marriage. At the time of the marriage, Joe lived in a sales trailer belonging to his employer. Joyce brought into the marriage a house located at 1733 Dahlia Drive in Greenville of which she was the sole owner. The Dahlia Drive house remained in Joyce's name after the marriage and served as the marital home for several years.
¶ 3. Upon Joe's acceptance of a job with Blue Bell Wrangler in Wichita, Kansas, the Dahlia Drive house was sold and the sales proceeds (approximately $40,000) were applied to a house in Wichita, which was jointly owned by Joyce and Joe. While in Wichita, Joyce worked as a licensed practical nurse in a hospital.
¶ 4. Three years later Joe was transferred by Blue Bell to Nashville, Tennessee. The sales proceeds from the Wichita house were applied to the purchase price *Page 304 
of a Nashville house. Again, Joyce and Joe were joint owners. In Nashville, Joyce held various jobs including working for two newspaper offices, for International Services at Peabody College, and as office manager for a podiatrist.
¶ 5. In February 1980, Joe was transferred with Blue Bell to Greenville, and Joyce and Joe jointly purchased a house at 253 Clover Circle. Joyce worked full-time as an office manager for Delta Bus Lines, Inc. Joe worked with Blue Bell for approximately a year in Greenville before accepting an early retirement package. After paying the necessary taxes and taking a vacation, Joe's retirement fund dwindled from $116,000 to $40,749.49, which funds were placed into a joint account with Dean Witter Reynolds for investment purposes.
¶ 6. The record shows that after retirement Joe owned and operated a gas station for about a year and held various jobs. Joyce continued to work full time for Delta Bus Lines, Inc.
¶ 7. Joyce testified that in December 1989, the parties separated and agreed to divide their marital assets. Joe executed a quitclaim deed giving Joyce exclusive ownership of the Clover Circle house in exchange for which he withdrew all monies from the Dean Witter Reynolds account and all but $380 from the joint checking account at Magnolia Federal Bank. Joe also assigned the title to a 1984 Oldsmobile to Joyce. He retained ownership of a 1988 Oldsmobile. Joe left for Biloxi. Joyce remained in Greenville.
¶ 8. With the funds from the Dean Witter account, Joe formed Magnolia Motors, a used car dealership, and purchased a certificate of deposit in the amount of $31,000 from Deposit Guaranty National Bank. While in Biloxi, he lived with his daughter.
¶ 9. According to Joe's testimony, he was going to Biloxi because the economic situation in Greenville was bad and he had to move to provide adequately for his family. He executed the quitclaim deed to enable Joyce to sell the house expeditiously without the necessity of him returning from Biloxi to sign any closing papers. The money withdrawn from the Dean Witter account, according to Joe, was to provide the financial backing to get into the used car business. Joe further testified that all bank accounts were opened in Biloxi in Joe and Joyce's names. However, the chancellor found that the accounts were opened in Joe and his daughter's names, not Joyce's name.
¶ 10. On July 29, 1991, Joyce sold the Clover Circle house. After paying off the mortgage, Joyce testified she received approximately $55,000 to $60,000. She purchased two $10,000 certificates of deposit with part of the sales proceeds.
¶ 11. Joe and Joyce attempted to reconcile in 1992 and jointly purchased a house at Lake Ferguson using a portion of the sales proceeds from the Clover Circle house. The two $10,000 certificates of deposit remained in Joyce's name and were not commingled with marital assets. The parties opened a joint checking account at the Bank of Hollandale. The mortgage payments of $313 on the Lake Ferguson house were withdrawn from the bank account monthly. The bank records show Joe deposited approximately $34,000 into the account, comprising $7,000 to open the account, two car sales and his monthly Social Security checks. During the same time period, Joe withdrew $35,822. Joyce's pay checks of approximately $550 were deposited monthly into the account.
¶ 12. In December 1993, the parties again separated. Joe left for the Mississippi Gulf Coast taking $6,000 and a gold coin worth $1,000, representing the $7,000 he originally placed into the joint bank account, in return for executing a quitclaim deed on the Lake Ferguson house. The Bank of Hollandale account remained open with Joyce depositing her pay checks into it monthly. Joe's Social Security checks were no longer deposited directly into the account. *Page 305 
¶ 13. Joe testified he left Greenville to return to Biloxi to make a go of his used car dealership. He executed the quitclaim deed simply to make it easy on Joyce to sell the Lake Ferguson house and to move to Biloxi with him. The $6,000 he took to Biloxi with him was for living expenses.
¶ 14. To rebut Joe's version of events, Joyce entered into evidence an unfiled complaint for divorce which was executed by Joe on February 11, 1994, incorporating a sworn settlement agreement. According to the settlement agreement:
 The parties have previously made provisions for all real and personal property owned by the parties at the time of the separation and there is no further need for settlement of any property rights.
¶ 15. In 1994, Joyce sold the Lake Ferguson house. Using the sales proceeds and the two $10,000 certificates of deposit, Joyce purchased the house at 528 Mayer Street, where she now resides. According to Joyce, Joe returned to Greenville infrequently for visits. The record shows Joe withdrew $3,500 from the Bank of Hollandale account on March 10, 1995; $100 on June 27; $130 on July 6; and $3,500 on July 12.
¶ 16. The parties finally separated in July 1995. According to Joyce's journal entries from January 1988 to December 1995, Joe lived in Greenville twenty-seven months and in Biloxi seventy-seven months. At the time of the divorce, Joyce was employed as office manager for Delta Bus Sales, Inc. Joe continued to buy and sell cars through Magnolia Motors.
¶ 17. Joyce filed her complaint for divorce on December 4, 1995, on the ground of habitual cruel and inhuman treatment, or, in the alternative, on the ground of irreconcilable differences. Joe answered the complaint denying the substance of Joyce's claim, and filed a counterclaim for divorce alleging habitual cruel and inhuman treatment by Joyce or, alternatively, irreconcilable differences. Prior to trial the parties consented to a divorce on the ground of irreconcilable differences leaving the court to resolve the issue of property distribution between Joyce and Joe. The chancellor entered his bench ruling on October 30, 1996, finding (1) the Dahlia Drive house owned by Joyce was her separate, independent property at the time of the marriage; (2) when the sales proceeds from the house ($40,000) were invested in the jointly-owned house in Wichita, the money lost its non-marital asset status and was converted into marital property; (3) the subsequent houses purchased by the Parsons remained marital property until Joe quitclaimed the Clover Circle house to Joyce in exchange for the remaining $40,000 in the Dean Witter account; (4) when the sales proceeds from the Clover Circle house was invested in the jointly-owned Lake Ferguson house, the funds once again became martial property; (5) the two $10,000 certificates of deposit purchased from the non-marital asset (the sales proceeds of the Clover Circle house) were not commingled with marital assets and retained their non-marital property status; (6) upon Joe's tender of a quitclaim deed to Joyce relinquishing his ownership in the Lake Ferguson house, the house was converted into a non-marital asset, not subject to equitable distribution; (6) the Mayer Street house was purchased by Joyce using funds from the sale of the Lake Ferguson house and the two $10,000 certificates of deposit which were non-marital assets. Therefore, the chancellor found the Mayer Street house was a non-marital asset, not subject to equitable distribution upon dissolution of the marriage.
¶ 18. The chancellor further found Joe formed Magnolia Motors and purchased a $31,000 certificate of deposit from Deposit Guaranty National Bank in 1989 with the funds withdrawn from the Dean Witter account. The chancellor also determined that Magnolia Motors was a going concern with value.
¶ 19. The chancellor granted the parties a divorce on the ground of irreconcilable differences, awarding the following: Joyce *Page 306 
to have sole ownership and possession of the house located at 528 Mayer Street in Greenville; Joyce to have sole ownership and possession of all contents located in the house; gifts given by Joe to Joyce consisting of an anniversary ring and gold nugget with diamond pendent shall remain the property of Joyce; Joe shall keep all items currently in his name and possession; Joe to receive that certain secretarial desk owned by his mother; Joe shall retain Magnolia Motors; each party to bear his or her own attorney's fees; and the court costs to be divided equally.
¶ 20. Aggrieved by the chancellor's findings as to the status of the 528 Mayer Street house, Joe filed a motion for new trial on October 29, 1996. On January 9, 1997, the chancellor entered an order denying the motion for new trial. Joe perfected this appeal.
 ARGUMENT AND DISCUSSION OF LAW
¶ 21. Our scope of review in domestic relations matters is limited. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Denson v. George,642 So.2d 909, 913 (Miss. 1994). This Court is not called upon or permitted to substitute its collective judgment for that of the chancellor. Richardson v. Riley, 355 So.2d 667, 668-69 (Miss. 1978). A conclusion that we might have decided the case differently, standing alone, is not a basis to disturb the result.Id.
¶ 22. Joe contends that the chancellor erred in characterizing the house purchased by Joyce from the sales proceeds of the Lake Ferguson house as a non-marital asset. We hold the chancellor did not abuse his discretion in finding that the Mayer Street house was not subject to equitable distribution as a marital asset and that such finding is supported by substantial evidence in the record.
¶ 23. The chancery court's authority to divide marital assets is born from principles of fairness which are rooted in the court's inherent powers of equity. Ferguson v. Ferguson, 639 So.2d 921, 927 (Miss. 1994). Chancellors are empowered to address realty assets and to divest title, including that of the marital home. Id. Concerning equitable division of assets at divorce, the Mississippi Supreme Court has opined:
 It is well-established by this Court that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties. However, there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court. . . . This Court, therefore, holds that the chancery court is within its authority and power to equitably divide marital assets at divorce.
Id.
¶ 24. In Ferguson, the supreme court promulgated a list of guidelines to assist chancellors in the division of marital property:
 [T]his Court directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with findings of fact and conclusions of law for purposes of appellate review. Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
 a. Direct or indirect economic contribution to the acquisition of the property;
 b. Contribution to the stability and harmony of the marital and family relationships *Page 307 
as measured by quality, quantity of time spent on family duties and duration of the marriage; and
 c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
 3. The market value and the emotional value of the assets subject to distribution.
 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
 8. Any other factor which in equity should be considered.
Ferguson, 639 So.2d at 928 (emphasis added).
¶ 25. Only marital property is subject to equitable distribution. The supreme court defined marital property in Hemsley v. Hemsley,639 So.2d 909 (Miss. 1994):
 Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' estates prior to the marriage or outside the marriage.
Id. at 914.
¶ 26. It is uncontroverted that the Dahlia Drive house was non-marital property. Joyce brought the house into the marriage and remained its sole owner after the parties married. However, "non-marital assets . . . may be converted to marital assets if they are commingled with marital assets or used for familial purposes." Heigle v. Heigle, 654 So.2d 895, 897 (Miss. 1995). "Commingled property is a combination of marital and non-marital property which loses its status as non-marital property as a result." Maslowski v. Maslowski, 655 So.2d 18, 20-21 (Miss. 1995). Moreover, title is no longer determinative in deciding a party's rights to the property. Hemsley, 639 So.2d at 914.
¶ 27. The status of the Dahlia Drive house changed when it was sold and the sales proceeds (approximately $40,000) were commingled with the marital assets to enable Joyce and Joe to purchase jointly the house in Wichita. The commingling of the sales proceeds converted the funds to a marital asset, subject to equitable distribution. Likewise, any subsequent house owned by the parties or the sales proceeds from each was a marital asset, subject to equitable distribution. Heigle v. Heigle, 654 So.2d at 897.
¶ 28. However, our analysis does not stop with the determination that each subsequent house jointly owned by the parties was a marital asset. Here the chancellor found the Parsons agreed to the distribution of marital assets prior to the divorce proceeding as evidenced by Joyce's testimony and the signed but not filed complaint for divorce dated February 11, 1994. Thus, in determining the equitable division of any property accumulated during the marriage, the chancellor duly considered the second factor delineated in Ferguson: "The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution *Page 308 of such assets by agreement, decree or otherwise." Ferguson, 639 So.2d 928. Further, the supreme court has held "[w]hen an individual commingles non-marital assets with joint marital assets, the non-marital assets are converted into marital assets, subject to an equitable distribution unless subject to an agreement to thecontrary." Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss. 1994).
¶ 29. In the present case, the chancellor found the parties agreed to the division of marital property in contemplation of divorce in December 1989. Joe received the remaining retirement funds in the joint investment account with Dean Witter totaling approximately $40,000, in exchange for which Joyce was given sole ownership of the marital home. Thus, by agreement by the parties, neither the retirement funds nor the Clover Circle house were marital assets.
¶ 30. Joyce sold the Clover Circle house and purchased two $10,000 certificates of deposit with a portion of the sales proceeds.
¶ 31. Reconciliation was attempted by the parties in 1992. The Lake Ferguson house was purchased jointly by Joyce and Joe using the remaining sales proceeds from the Clover Circle house. A joint checking account was opened with $7,000 contributed by Joe. Joe's monthly Social Security checks were deposited into the joint account. Joe continued to own and operate Magnolia Motors in Biloxi and ran a couple of car sales through the joint account. At that time, the Lake Ferguson house and the joint checking account were among the marital assets subject to equitable distribution. The two certificates of deposit were not commingled with the familial assets and remained non-marital property.
¶ 32. In December 1993 the parties separated and once again divided the marital assets by agreement. Joe relinquished his ownership in the Lake Ferguson house by quitclaim deed to Joyce in exchange for $7,000 (his initial deposit in the joint checking account). The record revealed that the other monies deposited into the account representing Joe's social security checks and any funds from the sale of cars had been withdrawn previously by Joe. Thus, the status of the Lake Ferguson house was converted into a non-marital asset, not subject to equitable distribution. Using the sales proceeds from the Lake Ferguson house of which she was the sole owner by virtue of the quitclaim deed executed by Joe and the two certificates of deposit she owned, Joyce purchased the Mayer Street house. Accordingly, we find the chancellor did not abuse his discretion by finding the Mayer Street house was not subject to equitable distribution as a marital asset.
¶ 33. After careful review of the record, it is apparent in the case sub judice that the chancellor reviewed all the evidence and kept in mind the financial and familial contributions of both parties and the prior agreements of the parties when considering the distribution of property. The chancellor also considered the fact that Joe still owned and operated Magnolia Motors and Joyce was gainfully employed. Furthermore, the chancellor's opinion made detailed specific findings in his equitable division of the marital assets.[1] The chancellor found that the parties had distributed the principal marital assets prior to instituting the divorce proceedings. When the parties separated the first time in contemplation of divorce, Joe assigned his interest in the marital home on Clover Street in Greenville to Joyce in exchange for the Dean Witter account to be used as *Page 309 
he saw fit. After the parties' attempted reconciliation failed, Joe assigned his interest in the jointly purchased Lake Ferguson house to Joyce in return for which he received $7,000 representing his initial deposit in a joint checking account.
¶ 34. We are satisfied that the chancellor was not manifestly in error in his finding that the house located at 528 Mayer Street in Greenville was non-marital property and thus not subject to equitable division. We affirm.
¶ 35. THE JUDGMENT OF THE WASHINGTON COUNTY CHANCERY COURT ISAFFIRMED. COSTS OF THIS APPEAL TAXED TO APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P., JJ., COLEMAN, DIAZ, IRVING,LEE, PAYNE, AND THOMAS, JJ., CONCUR.
[1] Although the chancellor failed to make any conclusions of law, it is this Court's opinion that he adequately considered the Ferguson factors in making an equitable distribution of the marital property, and that his specific findings of fact were sufficient for us to determine that there was no abuse of discretion. However, for future reference, we encourage chancellors in making their specific findings to include the appropriate conclusions of law as required by case law. SeeFerguson, 639 So.2d at 929.