981 So.2d 993 (2007)
Samuel Thomas OSWALT, Appellant
v.
Sandra Lynne Muirhead OSWALT, Appellee.
No. 2006-CA-01254-COA.
Court of Appeals of Mississippi.
October 2, 2007.
Rehearing Denied February 19, 2008.
*994 George M. Mitchell, Jr., Eupora, attorney for appellant.
Luther Putnam Crull, Jr., attorney for appellee.
Before LEE, P.J., GRIFFIS and ISHEE, JJ.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. Sandra Lynne Muirhead Oswalt (Sandi) and Samuel Thomas Oswalt (Sammy) were married on November 27, 1998, and separated on May 30, 2004, when Sandi moved out of the marital home. No children were born of the marriage. Details of the marriage will be discussed as relevant.
¶ 2. On June 21, 2004, Sandi filed for divorce in the Chancery Court of Choctaw County alleging habitual drunkenness and habitual cruel and inhuman treatment. Sammy filed a counter complaint alleging he was entitled to a divorce based on habitual cruel and inhuman treatment and desertion. During the trial, Sammy made a motion for directed verdict arguing that Sandi had failed to meet her burden of proof as to the two grounds that were the basis of her action. The chancellor sustained Sammy's motion in part finding that Sandi failed to prove her allegation of habitual drunkenness. However, the court *995 granted Sandi a divorce based on habitual cruel and inhuman treatment on March 17, 2006, and awarded Sandi forty percent of the marital assets.
¶ 3. Sammy now appeals to this Court citing the following issues: (1) the trial court erred in granting a divorce to Sandi on the ground of habitual cruel and inhuman treatment without the necessary proof to sustain such a ruling; (2) the trial court failed to properly address the requirements of Ferguson v. Ferguson in making an equitable division of the marital property; (3) the trial court failed to include in the evaluation and equitable division of the marital assets Sandi's increase in education and earning ability and other items; (4) the trial court erred by restricting the examination of witnesses concerning Sandi's relationship with members of the opposite sex; and (5) the trial court failed to characterize certain commingled property as separate. Issues two, three, and five will be discussed together as each asserts similar arguments.
¶ 4. Finding no error, we affirm.
I. DID THE TRIAL COURT ERR IN GRANTING A DIVORCE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT?
¶ 5. The standard of review in domestic relations cases is limited by the substantial evidence/manifest error rule. Mizell v. Mizell, 708 So.2d 55, 59(¶ 12) (Miss.1998). We will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 59(¶ 13). "This court will not substitute its judgment for that of the chancellor `even if this Court disagrees with the lower court on the findings of fact and might . . . [arrive] at a different conclusion.'" Owen v. Owen, 798 So.2d 394, 397-98(¶ 10) (Miss. 2001) (quoting Richardson v. Riley, 355 So.2d 667, 668 (Miss.1978)). However, we will conduct a de novo review for questions of law. Russell v. Performance Toyota, Inc., 826 So.2d 719, 721(¶ 5) (Miss.2002).
¶ 6. Habitual cruel and inhuman treatment is defined as conduct that (1) endangers life, limb or health or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the offended spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. Boutwell v. Boutwell, 829 So.2d 1216, 1220(¶ 14) (Miss.2002). The burden of proof in a habitual cruel and inhuman treatment case is a preponderance of evidence. Id.; Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993). Cruel and inhuman treatment is something more than unkindness or rudeness or mere incompatibility or want of affection. Chamblee v. Chamblee, 637 So.2d 850, 859 (Miss.1994). As a general rule, the habitual cruel and inhuman treatment must be shown to be routine and continuous; however, a single occurrence may be grounds for a divorce. Richard v. Richard, 711 So.2d 884, 888(¶ 13) (Miss.1998).
¶ 7. Sammy argues that insufficient evidence was presented for the chancellor to grant a divorce to Sandi based on habitual cruel and inhuman treatment. Sandi offered the following evidence in support of a divorce based on habitual cruel and inhuman treatment. On Sandi's birthday, in September 1999, the couple had been out but not together. Sammy arrived home first and went upstairs. Sandi came in later and decided to sleep downstairs to avoid waking Sammy. When Sammy discovered Sandi sleeping downstairs they had a physical confrontation from which Sandi suffered injuries. Photographs of her injuries were admitted into evidence *996 and her mother testified as to the injuries. Sammy argues that he was just trying to restrain her during this confrontation. The chancellor found that given the nature of her injuries it did not appear as if he was just trying to restrain her and thus chose to accept Sandi's version of the incident. Next, in July 2000, Sammy bruised Sandi's arm during a confrontation about going to a NASCAR race. A photograph of the bruise provided corroborating evidence of this altercation. Sandi further testified that Sammy was violent once or twice a month, but Sammy denied that physical altercations occurred.
¶ 8. Sandi testified that Sammy drank every day, and was drunk four days a week. Sandi's mother testified that Sammy frequently consumed beer. She also testified that Sandi telephoned her once or twice a month crying and upset over Sammy's actions. Sammy threatened suicide on more than one occasion and fired a shotgun to make Sandi think he had shot himself. On another occasion when he was drinking and the couple was arguing, he got out a shotgun and Sandi left the house out of fear. Sandi also testified that Sammy belittled her and threatened to burn her clothes.
¶ 9. The chancellor noted that although Sandi alleged that she feared Sammy she was in his presence several times after their separation. Most of these times were explained by Sammy's desire for her to return home. Regardless, Sandi's testimony at trial was that her returning to the marriage was not a possibility. We cannot find that the chancellor erred in finding that this did not prevent Sandi from obtaining a divorce.
¶ 10. Given the above allegations and evidence corroborating Sandi's testimony, we cannot find that the chancellor committed manifest or clear error as to law or fact in granting Sandi a divorce based on habitual cruel and inhuman treatment. Substantial evidence existed to support the chancellor's ruling. The physical assaults on Sandi together with Sammy's tendencies toward suicide were enough to give Sandi a reasonable apprehension of danger to her life, limb, and health. Having found no merit in Sammy's arguments and having found no manifest error, we affirm the judgment of the chancellor granting Sandi a divorce on the ground of habitual cruel and inhuman treatment.
II. DID THE TRIAL COURT PROPERLY ADDRESS THE FERGUSON FACTORS IN MAKING AN EQUITABLE DIVISION OF THE MARITAL PROPERTY?
¶ 11. This Court employs a limited standard of review of property division and distribution in divorce cases. Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). A chancellor's division and distribution will be upheld if it is supported by substantial credible evidence. Carrow v. Carrow, 642 So.2d 901, 904 (Miss.1994). However, this Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard. Id.
¶ 12. Sammy first argues that the chancellor erred in granting the divorce, and thus there should have been no division of marital assets. Having found in Issue I that Sandi presented sufficient grounds for divorce, we will address whether the chancellor based the division of assets on substantial credible evidence. The chancellor awarded Sandi forty percent of the marital assets and awarded Sammy sixty percent of the marital assets. Sammy argues that the chancellor did not properly address the Ferguson factors in making this determination.
*997 ¶ 13. The first step in property distribution as a result of divorce is to classify the property as either marital property or non-marital property based on Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), in which the supreme court defined marital property for divorce proceedings as any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor. Stewart v. Stewart, 864 So.2d 934, 937(¶ 12) (Miss.2003). We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value. Id. Separate property that has been "commingled with the joint marital estate" also becomes marital property subject to equitable distribution. Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss. 1994). "Assets which are classified as nonmarital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." Boutwell, 829 So.2d at 1221(¶ 20) (citing Heigle v. Heigle, 654 So.2d 895, 897 (Miss.1995)).
¶ 14. Although "fairness is the prevailing guideline in marital division," the supreme court has set out the following guidelines for chancery courts to consider, where applicable, when attempting to effect an equitable division of marital property:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994).
¶ 15. Sammy argues that the chancellor failed to consider certain acts committed by Sandi in determining contribution to marital stability. For example, he alleged that Sandi exposed her breasts at public *998 events, drank alcohol, and had sexual relations in the back of a parked car. However, the incident where she exposed herself in public was done with his approval, and the sexual encounter in the back of the parked car was with Sammy. As for Sandi's consumption of alcohol, no evidence was presented that her drinking adversely affected the quality of their marriage especially taking into consideration Sandi's testimony that Sammy drank every day that they were married.
¶ 16. Sammy argues that the trial court failed to consider Sandi's increase in education and earning ability and other assets. Sammy argues that Sandi's earning capacity increased from $26,000 to $50,000 after the completion of her educational specialist degree. He argues that no evidence was presented stating her source of income during her education, and thus it must be presumed that her financial support was from the marriage. We cannot agree with this assertion. Sandi testified that she received financial assistance from the Choctaw County School District, and she worked full time while in school. During the time that the couple was married, Sandi took course work and received her masters degree in counselor education. Sandi's income doubled while Sammy had a loss in earning capacity. Sammy argues that the chancellor failed to take the health of the parties into consideration. He states that he has limited learning capacities and lack of formal education. He also argues that his back problems and Sandi's testimony that she was in good health should have been taken into consideration. We find that the chancellor took this into consideration.
¶ 17. Sammy next argues that the chancellor erred in characterizing items owned by "S.S. Oswalt," a business he created, as marital property. These items include several cash gifts from his mother, a Ford F-150 truck, a Jeep, three hauling trailers, a John Deere tractor and other equipment. The chancellor found that the Jeep was obtained by trading other marital assets and was thus a marital asset. As for the tractor and equipment, the chancellor found that these were purchased with money given to Sammy by his mother to start S.S. Oswalt. The funds were originally either deposited into the couple's joint account or into the business account. All of his earnings from the business went into the business account. However, Sammy regularly moved funds back and forth from the business account to the joint account and part of the funds were used for marital activities. Sammy testified that Sandi would write checks out of the S.S. Oswalt account and deposit them into the joint account for reimbursement of insurance paid on Sammy's children. The chancellor found that the commingling of the funds made them a marital asset. The chancellor did take into consideration any gifts given to Sammy under the Ferguson factors.
¶ 18. During the marriage, Sammy sold stock which he had accumulated prior to the marriage for $198,000 in the closing of his family's construction business. This money was deposited into the joint account. The money was used for expenses such as the couple's house payment, groceries, etc. The chancellor found that since these funds were commingled and used for marital expenses, the funds became marital property. However, the chancellor took into consideration the proceeds from the sale of stock solely owned by Sammy under the Ferguson factors.
¶ 19. Sammy testified that it was his practice to sell boats, motorcycles, vehicles, and other items he owned to upgrade. As for one of the boats, he testified that he sold it because Sandi did not like that his first wife had ridden in it. This does not *999 make the boat less of a marital asset. Sammy testified that he used $16,000 from the sale of a motorcycle to purchase the new one for $22,000. His argument is that the chancellor erred in classifying the entire value of the new motorcycle and boat as marital because most of the funds used to purchase them were from the sale of older models purchased prior to the marriage. However, this argument is without merit. Also, the chancellor took into account the value of the assets purchased prior to the married and applied it to the value of the upgrades.
¶ 20. Sammy gave Sandi a diamond ring and belly button ring that the chancellor determined to be gifts to Sandi and thus non-marital property. Sammy argues that the money used to pay for the reconstruction of the belly ring came from marital funds. Sammy also argues that the belly ring belonged to his first wife and he was just letting Sandi use it. The supreme court held in Ferguson that chancellors must determine for this Court's review whether an interspousal gift is a highly personal one or whether some type of property, i.e., stocks and bonds, may require something beyond a gift analysis. Id. Given the personal nature of these items and that both were sized to fit Sandi, the chancellor found these to be gifts and non-marital property. Even though acquired during the marriage with marital assets, personal gifts of this nature are separate personal property of the donee.
¶ 21. Sammy argues that he should have been awarded the marital home because it was his prior to the marriage. Sammy argues that due to the short marriage only minor contributions could have been made by Sandi. He also asserts that there was no testimony evidencing any improvements or financial contributions made by her to the home. Sammy's argument is without merit as the chancellor took into account the equity Sammy had acquired in the house before the marriage. This amount was awarded to Sammy. The balance of the sale of the house was found to be a marital asset as it was the result of payments made during the marriage, improvements made during the marriage, and inflation. Sammy argues that he should receive all proceeds from the sale of the marital home because he owned the home prior to the marriage and no ownership rights were transferred to Sandi during the marriage.
¶ 22. We find that the chancellor correctly found the couple's home was marital property. During the marriage, money from the couple's joint checking account was used to make payments on the house and the house was used for marital purposes. The house was renovated and the yard was landscaped through the efforts of both parties. The chancellor took into consideration that Sammy purchased the home before the marriage stating that "[h]e has some pre-marital asset contribution to it and this will be considered in making the division of the marital property."
¶ 23. Sammy next argues that Sandi took between $15,000 and $20,000 from a safe in the marital home, and the chancellor failed to include this as marital property. Sammy implies that Sandi used this money to pay for the expenses related to the mobile home Sandi purchased after their separation as well as a tanning bed and computer. Sandi admitted that she took $7,300 from the safe. The chancellor found in his opinion, "She admits she took seven thousand three hundred dollars ($7,300) in cash from the safe. He says it was more, but there is no proof of this. The Court, thus, accepts the seven thousand three hundred dollars ($7,300) as the correct amount." She testified that she spent $3,100 of this on an income tax obligation *1000 the couple incurred. The chancellor categorized the remaining $4,200 as marital property. Without additional proof, we cannot find that the chancellor erred in weighing the testimony and accepting Sandi's testimony as true.
¶ 24. After the couple separated Sandi purchased a mobile home. Sandi testified that she borrowed money from her parents to purchase the mobile home. Sammy argues that Sandi did not present documentation to support her testimony that the money for the house came from her parents. However, Sandi presented bank documents and a bill of sale of the transfer from Sandi's father to herself. The chancellor did find that $2,000 of the purchase price of the mobile home was taken from a safe in the marital home and was included as a marital asset. In his brief, Sammy argues that the source of the money Sandi spent setting up the mobile home such as moving costs, a deck, carport, and septic tank should be taken into account. He argues that these and other assets she purchased should be considered marital assets because they were purchased after the separation but prior to a line of demarcation being established. However, Sammy has provided no evidence that the money for any of these assets was marital.
¶ 25. We find that the chancellor did not err in his characterization and division of assets. This issue without merit.
IV. DID THE TRIAL COURT ERRONEOUSLY RESTRICT CROSS-EXAMINATION OF SANDI'S WITNESSES?
¶ 26. Sammy argues that the chancellor committed reversible error by limiting the cross-examination of Sandi and her mother regarding an extramarital relationship after the couple's separation.
¶ 27. When counsel for Sammy asked Sandi's mother about the alleged relationship, Sandi's attorney objected on the ground that Sammy had not alleged adultery as a basis for divorce. The chancellor sustained the objection and gave Sammy's attorney the opportunity to amend his counterclaim to include adultery. Sammy elected not to make the motion. In fact, it was Sammy's position that he did not want a divorce. Our standard of review for the chancellor's admission or exclusion of evidence is abuse of discretion. Stockstill v. Gammill, 943 So.2d 35, 44(¶ 18) (Miss. 2006). We cannot find that the chancellor abused his discretion in restricting testimony regarding Sandi's alleged relationship with another man.
¶ 28. THE JUDGMENT OF THE CHOCTAW COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
¶ KING, C.J., MYERS, P.J., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.