GRIFFIS, J.,
for the Court.
¶ 1. Patricia Fleishhacker appeals the chancellor’s division of the marital assets and award of alimony. We affirm in part and reverse and remand in part for further proceedings consistent with this opinion.
FACTS
¶2. Patricia and Walter Fleishhacker were married on January 3, 1981. They separated on February 3, 2001, after Patricia learned that Walter had an affair with another woman. No children were born to the parties. Patricia and Walter lived a very comfortable and affluent lifestyle.
¶ 3. Prior to 1981, Walter purchased a twenty-five percent interest in the stock of Northeast Metal Processing, Inc. (“NMP”). NMP is a successful scrap metal business that is located near Tupelo, Mississippi. NMP was the Fleishhackers’ primary source of income throughout their marriage.
¶ 4. In 1993, Walter bought the remaining seventy-five percent of NMP’s stock. Thus, he became the sole stockholder of NMP.
¶ 5. On April 4, 1996, Walter conveyed an interest in the NMP stock to Patricia. The stock certificates were then titled to, “Walter Fleishhacker and Patricia Fleish-hacker as joint tenants with rights of sur-vivorship.” On the same day, Walter and Patricia executed an agreement that related to the stock ownership of NMP. The terms of the agreement will be discussed in detail later.
¶ 6. On April 1, 2004, Patricia filed her complaint for divorce. On April 19, 2004, Walter filed his answer and cross-complaint for divorce.
¶ 7. On June 22, 2004, the chancellor executed an “Agreed Order on Temporary Features.” In this order, Walter agreed to pay: Patricia the sum of $1,500 per month as temporary alimony, certain other specified monthly bills, maintain health and accident insurance coverage for the benefit of Patricia, and paid Patricia’s medical expenses.
¶ 8. A trial was held on May 7-12, 2007. On July 6, 2007, the chancellor executed a judgment for divorce, nunc pro tunc, to June 15, 2007. It is from this judgment that Patricia appeals.
STANDARD OF REVIEW
¶ 9. Our scope of review in domestic matters is limited. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002).
ANALYSIS

1. Did the chancellor err in the valuation and division of the NMP, Inc., stock?

¶ 10. The chancellor determined that Walter owned twenty-five percent of the stock in NMP “at the time of the marriage of the parties and further [found] these *907 items to be separate property of [Walter] and thus not marital assets.”
¶ 11. ' Patricia claims this was error, and she makes two separate arguments. First, Patricia claims that the chancellor erred by determining that twenty-five percent of NMP’s stock was Walter’s non-marital separate property because Walter commingled the property during the marriage. Hence, Patricia claims that one hundred percent of the value of NMP should be subject to equitable division. Second, Patricia argues that even if the chancellor was correct to determine that twenty-five percent of NMP’s stock was Walter’s non-marital separate property, the chancellor erred by valuing the separate interest as of the date of the temporary order rather than the date of the parties’ marriage. Walter argues that the chancellor was correct on both of these issues. We find that the chancellor was correct in his determination of the first argument, but we also find that the chancellor committed reversible error on the second argument.
¶ 12. The Mississippi Supreme Court has established guidelines that must be followed for the equitable division of assets. Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). Likewise, the court has established guidelines for an award of periodic alimony and an award of lump-sum alimony. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993) (periodic alimony); Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss.1988) (lump-sum alimony).
¶ 13. Equitable division of assets begins with the chancellor’s classification of assets as marital versus non-marital. Hemsley v. Hemsley, 639 So.2d 909, 914-15 (Miss.1994). In Hemsley, the supreme court held:
We define marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor. We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value.
Id. at 915. Thus, Hemsley required the chancellor to consider: (a) the assets acquired or accumulated during the marriage as marital assets, and (b) Patricia’s domestic contributions and efforts were equal in value to Walter’s economic contributions and efforts.
¶ 14. Assets that are “accumulated during [a] marriage are ... marital property ‘subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.’” Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994) (quoting Hemsley, 639 So.2d at 914-15). However, “when an individual commingles non-marital assets with joint marital assets, the non-marital assets are converted into marital assets, subject to an equitable distribution unless subject to an agreement to the contrary.” Parsons v. Parsons, 741 So.2d 302, 308(¶ 28) (Miss.Ct.App.1999).

A. Did the chancellor err by determining that twenty-five percent of NMP’s stock was Walter’s non-marital separate property?

¶ 15. Patricia and Walter were married in January 1981. Prior to their marriage, Walter owned twenty-five percent of the stock of NMP. In 1993, Walter acquired the remaining seventy-five percent of NMP’s stock and became NMP’s sole stockholder. There is no dispute that the seventy-five percent interest in the stock *908 of NMP is marital property and subject to equitable division.
¶ 16. Patricia argues that the chancellor erred when he determined that the twenty-five percent of the NMP stock would be considered a non-marital asset. She claims that Walter conveyed her an ownership interest in the stock during the marriage.
¶ 17. On April 2, 1996, Walter and Patricia executed an agreement that related to the stock ownership of NMP. The agreement provided:
Whereas, Walter Fleishhacker owns fifteen (15) shares of the outstanding stock of Northeast Metal Processors, Inc. (the “Stock”) and Walter Fleishhacker is currently the sole shareholder of Northeast Metal Processors, Inc.; and
Whereas, Walter Fleishhacker desires to change the form of ownership of the Stock from his sole name to “Walter Fleishhacker and Patricia Fleishhacker as joint tenants with rights of survivor-ship”; and
Whereas, to induce Walter Fleishhacker to change the form of ownership of the Stock, Patricia Fleishhacker desires to make certain covenants with respect to the stock.
Now, therefore, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:
1. Walter Fleishhacker agrees to have the certificate evidencing the Stock reissued in the names of “Walter Fleishhacker and Patricia Fleish-hacker as joint tenants with rights of survivorship.”
2. Patricia Fleishhacker agrees to convey her joint ownership interest in the Stock to Walter Fleishhacker, without cost, at any time that such transfer is requested by Walter Fleishhacker.
3. Patricia Fleishhacker agrees not to transfer or encumber her interest in the Stock without prior written permission of Walter Fleishhacker.
4. Patricia Fleishhacker agrees that in the event of her divorce or separation from Walter Fleishhacker, then, and in such event, her joint ownership of the Stock shall not give her any greater interest in Northeast Metal Processors, Inc., than she would otherwise have.
5. This Agreement shall terminate on the death of the first of Walter Fleishhacker or Patricia Fleishhacker to die or at such earlier time as the parties may mutually agree.
6. It is the intention of the parties that title to the Stock shall vest completely in the survivor by operation of law upon the death of the first of them to die.
¶ 18. On April 4, 1996, Walter conveyed Patricia a joint interest in one hundred percent of the NMP stock. Walter had the NMP stock certificates reissued, and the ownership of all the stock was titled in the names of, “Walter Fleishhacker and Patricia Fleishhacker as joint tenants with rights of survivorship.” The legal effect of this conveyance was that Walter and Patricia were joint owners of the stock, subject to the terms of the agreement. Upon the death of either Walter or Patricia, the full and complete ownership of NMP’s stock would immediately pass to the survivor.
¶ 19. Patricia claims that the 1996 conveyance commingled Walter’s twenty-five percent of NMP stock, thereby making it marital property. Patricia cites A & L, Inc. v. Grantham, 747 So.2d 832 (Miss.1999), for the proposition that an increased interest in an investment can transform a premarital interest into a marital asset. *909 In Grantham, the husband owned a twenty percent interest in a building prior to the marriage and acquired an additional five percent interest during the marriage. Id. at 840(¶ 81). The facts about the interest are sparse, but the chancellor “noted that it was not proven by [the husband] that the assets claimed to be separate were not in fact marital” and included the “entire interest ... in the distribution.” Id. at 840-41 (¶¶ 82-38). The supreme court found that the chancellor’s “failure to separate the portion of the building which was acquired prior to the marriage [was] insufficient to upset the chancellor’s equitable division.” Id. at 841(¶ 33).
¶ 20. Patricia argues that Walter’s premarital shares of stock and the marital shares of stock of NMP were commingled because the April 4, 1996 agreement combined all the shares into one asset. Patricia claims that several marital assets were titled in the name of NMP, and according to Patricia, both Walter and she participated in the successful operation of NMP during their marriage. However, Walter minimized Patricia’s role in the business.
¶ 21. Assets that are “accumulated during [a] marriage are ... marital property ‘subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.’ ” Johnson, 650 So.2d at 1285 (quoting Hemsley, 639 So.2d at 914-15). However, “when an individual commingles non-marital assets with joint marital assets, the non-marital assets are converted into marital assets, subject to an equitable distribution unless subject to an agreement to the contrary.” Parsons, 741 So.2d at 308(¶ 28) (internal quotations omitted).
¶ 22. It is apparent that the chancellor found that Walter’s premarital interest in the NMP stock should not be included in the marital property. However, neither the chancellor’s opinion nor judgment gives this Court the benefit of his rationale. Indeed, the chancellor does not discuss the 1996 agreement or the joint ownership of the stock. However, any review of the agreement requires the same result.
¶ 23. The 1996 agreement and the reissued stock made Patricia a “joint” owner of NMP. As such, she immediately had full and complete rights as a shareholder. She agreed that she would not convey, transfer, or encumber her interest in the stock. However, the agreement specifically provided for what would happen if they were to divorce. Patricia agreed in paragraph four of the 1996 agreement to the following:
4. Patricia Fleishhacker agrees that in the event of her divorce or separation from Walter Fleishhacker, then, and in such event, her joint ownership of the Stock shall not give her any greater interest in Northeast Metal Processors, Inc., than she would otherwise have.
(Emphasis added).
¶24. At trial, Walter testified to the following:
Q. I asked you relative to this 25 percent that you’re asking the Court to regard as separate property. Yesterday, introduced into evidence was Exhibit No. 41 and 42, and [I] ask if you will glance at those two documents and tell the Court what they are.
A. One is an agreement that was signed by Patricia in Albert Delga-dillo’s office when the stock was changed in terms of not only the number of shares available but Patricia’s name was [also] put on the stock.
Q. All right. Now—
A. That agreement—
*910 Q. I’m sorry.
A. —basically gives me the right by request and/or through divorce or separation to have those shares returned to me. The other document is a irrevocable stock bond power that was signed at the same time in Mr. Albert Delgadillo’s office that was not dated because at that point in time, I did not ask for the stock but put it in her name as well as mine to avoid a problem that existed in a prior divorce with a will— that existed in a prior divorce that indicated my estate would go to my daughter in the event of my death and it was changed at that time.
Q. Mr. Fleishhacker, that’s not what I’m asking you. Those two documents that you have—
A. Yes, sir.
Q. —41 and 42, did you utilize Exhibit No. 41, and more especially 42, the stock transfer power?
A. Yes.
Q. Did you utilize those after you and Patricia separated but more especially after Patricia filed for divorce? Did you meet with your corporate attorney, Mr. Delgadillo, and cause the stock to be reissued in just your name?
A. Yes, sir.
Q. And currently, are you holding 149,-000 shares of [NMP] stock?
A. I am.
¶ 25. The effect of the April 2, 1996, agreement could have resulted in the commingling of the NMP stock as a joint asset of the parties. However, the chancellor determined that the commingling of the stock was “subject to an agreement to the contrary,” i.e., paragraph 4 of the April 2, 1996, agreement, and this was sufficient to maintain the non-marital identity of the premarital shares of the NMP stock. See Parsons, 741 So.2d at 308(¶ 28). It is apparent that the chancellor agreed with Walter’s argument that the 1996 agreement evidences the parties’ intent for Walter’s premarital interest in twenty-five percent of the NMP stock to remain Walter’s non-marital separate property.
¶26. We find no error and affirm on this issue.

B. Did the chancellor err by valuing Walter’s twenty-five percent of the NMP stock as of the date of the temporary order rather than the date of the parties’ marriage?

¶ 27. Patricia also argues that even if the chancellor did not err in finding that twenty-five percent of the NMP stock was Walter’s non-marital separate property, the chancellor erred by valuing Walter’s separate interest as of the date of the temporary order rather than the date of the parties’ marriage. Patricia claims that the chancellor should have valued Walter’s twenty-five percent interest in the NMP stock as of the date of their marriage, January 3, 1981, instead of simply taking twenty-five percent of the value of the NMP stock on June 30, 2004. The essence of this argument is that the appreciation of Walter’s non-marital asset was marital property.
¶ 28. Professor Deborah H. Bell explains the importance of classifying the appreciation of a non-marital asset during the marriage as active or passive. Deborah H. Bell, Miss. Family Law § 6.02[3][b] (1st ed.2005). “If the increase resulted from a spouse’s efforts, the appreciation is ‘active’ or marital. Appreciation resulting Jfrom other causes — passive appreciation — remains separate.” Id. at § 6.03[4][a],
¶ 29. Professor Bell’s explanation is consistent with the holding Craft v. Craft, *911 825 So.2d 605 (Miss.2002). In Craft, the supreme court held that while the wife was not entitled to the husband’s non-marital asset, “she [was] entitled to an equitable distribution of the accumulated portion or the increase in value of [the asset]” because the appreciation of the husband’s asset is considered marital property. Id. at 609(¶ 14).
¶ 30. In Hankins v. Hankins, 866 So.2d 508, 512(¶ 20) (Miss.Ct.App.2004), this Court recognized that “the relationship between a wage-earning spouse and a homemaking spouse is symbiotic” and the presumption “that the efforts of each make the contributions of the other possible.” We held that the wife was “entitled to an equitable distribution of ‘the accumulated portion, or the increase in value’ of the business during the course of the marriage.” Id. (citing Craft, 825 So.2d at 609(¶ 14)).
¶ 31. In Grantham, the supreme court addressed the appropriate consideration of the equitable division of stock of a closely held corporation, when the value of the stock increases during the term of the marriage. Grantham, 747 So.2d at 838-39 (¶¶ 16-25). The supreme court determined that the increase in the value of the corporation due to the husband’s managerial efforts, which occurred during the marriage, was a marital asset. Id. at 839(¶ 24).
¶ 32. The chancellor simply determined the value of twenty-five percent of the NMP stock as of June 30, 2004, and concluded that such amount was non-marital separate property. This deprived Patricia of the appreciation of this interest since the date of the parties’ marriage in 1981. The appreciation of the value of the twenty-five percent of the NMP stock was clearly a marital asset. Therefore, we find that it was error for the chancellor not to consider the accumulated value of the NMP stock as a marital asset, subject to equitable division under Hemsley. Accordingly, we find that the chancellor was manifestly wrong and clearly erroneous when he determined that the accumulation or increase in value of Walter’s twenty-five percent interest in the NMP stock, from the date of the parties’ marriage through the date of the temporary order, was not property accumulated during the marriage. We reverse and remand this case to the chancellor for an equitable division of this appreciated portion of the fair market value of Walter’s twenty-five percent interest in the NMP stock.

2. Did the chancellor err when he the failed to include the debt owed by Walter to NMP in the value of the business?

¶ 33. Patricia argues that the loan Walter took from NMP should have been included in the value of NMP. Walter argues that: (1) the chancellor was correct when he found these loans were a debt that Walter owed himself, and (2) the money was used to support himself and Patricia.
¶ 34. Patricia’s support for her argument that the debt was erroneously excluded is that “[t]he cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders.” Buchanan v. Ameristar Casino Vicksburg, Inc., 957 So.2d 969, 977(¶ 27) (Miss.2007) (citing Gray v. Edgewater Landing, Inc., 541 So.2d 1044,1047 (Miss.1989)). However, the issue before this Court is whether the marital distribution was equitable; it does not involve piercing the corporate veil as was the issue in Buchanan.
¶ 35. Walter testified that he frequently took loans from NMP. As of June 30, 2004, NMP’s books indicated that Walter owed a balance of $1,080,292 on these loans. Two *912 competing experts testified about the value of NMP on June 80, 2004. Patricia’s expert gave two valuations of the company: $8,400,000 if Walter’s debt was taken into consideration and $2,325,000 if his debt was excluded. Walter’s expert valued the company at $1,418,550.
¶ 36. Patricia’s expert testified that it “[did not] matter which way you looked at [the debt];” but rather, it was important to treat it consistently — either as: (1) Walter’s debt and the NMP’s asset or (2) neither a debt nor an asset. The chancellor accepted Patricia’s valuation of $2,325,000. The chancellor excluded Walter’s debt from the valuation of NMP because this was debt to Walter himself. As the sole shareholder, the debt was being paid by Walter to himself.
¶ 37. Furthermore, Patricia also enjoyed the benefits of these loans. Walter testified that he used this money to take care of his mother and brother, to pay his and Patricia’s gambling debts, and to pay off a $140,000 loan that Patricia owed. We find that the chancellor’s finding that the debt should be excluded from the value of NMP was supported by substantial evidence. Accordingly, we find no error as to this issue.

3. Was it error to use the value of NMP on the date of the temporary order, not the date of their divorce, for equitable distribution?

¶ 38. Patricia claims that the chancellor should have used the value of NMP at the time of the divorce for equitable distribution, or in the alternative, any appreciation of the asset between the time that the temporary order was entered and the divorce was finalized is marital property. Walter argues that there is no Mississippi case law that supports Patricia’s claim and that the chancellor was within his discretion when he used the temporary order as the line of demarcation.
¶ 39. Patricia acknowledges in her brief that there is no Mississippi case law that “firmly establishes whether the appreciation of a going concern remains marital property after a temporary order is entered.”
¶ 40. The supreme court has “held that ‘when equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor.’ ” Hensarling v. Hensarling, 824 So.2d 583, 591(¶ 25) (Miss.2002) (quoting MacDonald v. MacDonald, 698 So.2d 1079, 1086 (Miss.1997)). The chancellor used the temporary order as the date to value NMP, basing his decision on Godwin v. Godwin, 758 So.2d 384 (Miss.1999) and Pittman v. Pittman, 791 So.2d 857 (Miss. Ct.App.2001). In Godwin, the supreme court held that the order for separate maintenance “create[d] a point of demarcation with respect to the parties and their estates.” Godwin, 758 So.2d at 386(¶ 6). Furthermore, the supreme court explained that:
Assets acquired after an order for separate maintenance should be considered the separate property of the parties, absent a showing of either (1) contribution to the acquisition of the asset by the other spouse as contemplated in our decisions in Ferguson v. Ferguson, 639 So.2d 921, 928-29 (Miss.1994), and Magee v. Magee, 661 So.2d 1117, 1123 (Miss.1995) or, (2) acquisition of the asset through the use of marital property.
Id. at 386(¶ 7). In Pittman, this Court extended this treatment from separate maintenance orders to temporary support orders. Pittman, 791 So.2d at 864(¶ 18).
¶ 41. The chancellor found that the val *913 ue of NMP was $2,825,000[1] at the time the temporary order was entered on June 30, 2004. The chancellor did not make findings of fact about the value of NMP on the date of the divorce, but Patricia’s expert testified that the value of NMP was $4,475,000[2] on October 31, 2006, less than a year before this trial. In two years and four months, NMP’s value increased approximately $2,100,000. Patricia admits that this increase in value is not attributable to her efforts.
¶42. Patricia argues that we should treat this increase as an exception under Godwin because this is the acquisition of assets through the use of the marital property. In Godwin, the supreme court explained that it was “referring to the use of marital property, such as cash or some other like asset, to purchase property or the use of marital property as collateral or security for the purchase of property.” Godwin, 758 So.2d at 386 n. 1. NMP does not qualify under this exception. Here, the asset — NMP—was not used as collateral or security to acquire another asset. Thus, the chancellor did not err in valuing NMP on the date of the temporary order.
¶ 43. However, our inquiry does not end here. Pittman and Godwin do not address the issue of passive appreciation after the line of demarcation — here, the date of the temporary order. This is an issue of first impression. In her book, Professor Bell explains the importance of differentiating between active and passive appreciation after a line of demarcation is established. “Appreciation in asset value after a cutoff date is separate if the appreciation was caused by the active efforts of one spouse. Passive appreciation — caused by other forces — will take the classification of the underlying asset.” Bell, Miss. Family Law at § 6.02[3][b],
¶ 44. Patricia’s expert witness explained that NMP has “widely varying performance based on the overall level of scrap prices.” The record reflects that Walter was in sole control of the business during this time, and the success of the business is dependent on his efforts and his relationship with a few large customers.
¶ 45. We hold that the passive appreciation of NMP from the date of the temporary order to the date of the divorce is a marital asset to the extent that NMP is a marital asset. We remand this issue with directions for the chancellor to reevaluate the marital distribution after he determines and considers the appreciation of the value of NMP caused by the active efforts of Walter — which is separate property — and the passive appreciation caused by other forces, such as market forces— which is marital property.[3]
j. Was Patricia’s jewelry improperly included in the marital property?
¶46. Patricia argues that all of her jewelry, which were gifts from Walter, should not have been included in the marital property. Walter claims that the jewelry was correctly included in the marital property.
¶ 47. The chancellor included both parties’ jewelry in the marital property be *914 cause “it was basically an interspousal transfer of property pursuant” citing Myrick v. Myrick, 739 So.2d 432 (Miss.Ct.App.1999). In Myrick, this Court held that the couple’s marital home was marital property even though the husband “executed a deed conveying his interest in the property to” the wife, because “interspousal transfers of marital property during the marriage may not be used to support a claim that the transfer was a gift intended to deprive the property of its status as a marital asset.” Id. at 434(¶ 5).
¶ 48. Here, the chancellor did not have the benefit of our more recent decision in Oswalt v. Oswalt, 981 So.2d 993 (Miss.Ct.App.2007), when he decided this issue. In Oswalt, we again addressed whether gifts of jewelry between spouses should be considered marital property. We held that “[e]ven though acquired during the marriage with marital assets, personal gifts of this nature are separate personal property of the donee.” Id. at 999(¶ 20).
¶ 49. It is the chancellor’s responsibility to determine “whether an interspousal gift is a highly personal one or whether some type of property, i.e., stocks and bonds, may require something beyond a gift analysis.” Ferguson, 639 So.2d at 929.
¶ 50. The chancellor found that all of Patricia’s jewelry were gifts from Walter, but he did not make specific findings about Walter’s jewelry. In light of our holding in Oswalt and the highly personal nature of the gifts, we reverse the award of marital assets and remand to the chancery court to re-evaluate the marital distribution consistent herewith.

5. Did the chancellor err when he failed to determine whether the couple’s memberships in the Old Wa-verly Golf Club and Cameron Club were marital property?

¶ 51. Patricia argues that the chancellor committed reversible error when he failed to classify, value, and distribute the club memberships. Walter claims that the chancellor could not have classified the memberships because Patricia did not present any proof as to the value.
¶ 52. “[T]he established precedent requires that all marital assets must be considered to reach an equitable division of those assets.” Hopkins v. Hopkins, 703 So.2d 849, 850(¶ 7) (Miss.1997). However, “the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof.” Dunaway v. Dunaway, 749 So.2d 1112, 1118(¶ 14) (Miss.Ct.App.1999) (citing Ferguson, 639 So.2d at 929).
¶ 53. Patricia listed both memberships on her Uniform Chancery Court Rule 8.05 financial statement. She testified that both memberships were acquired during the marriage and that she and Walter had purchased founding memberships in the Cameron Club for $10,000. Walter presented no evidence of the value of these memberships. Walter retained possession of the memberships after the divorce.
¶ 54. In his “proposed findings of fact and conclusions of law,” the chancellor mentioned the memberships when describing Patricia’s and Walter’s lifestyles during their marriage. However, the memberships were not classified, valued, or distributed in the judgment for divorce. Even though the parties did a poor job of valuing these assets, Patricia did testify about the initial cost of the Cameron Club membership, and Walter did not dispute her testimony. Therefore, we find that Walter’s argument that the chancellor could not classify, value, and distribute the memberships because Patricia did not offer any proof as to the value is without merit.
*915 ¶ 55. We reverse and remand on this issue so that the chancellor can classify, value, and distribute these memberships and, if necessary, hear any needed additional evidence to aid in this decision.
¶ 56. THE JUDGMENT OF THE CHANCERY COURT OF LEE COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., AND ISHEE, J., CONCUR. CARLTON AND MAXWELL, JJ., CONCUR IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL, J., AND JOINED IN PART BY CARLTON, J. BARNES AND ROBERTS, JJ., NOT PARTICIPATING.

. This valuation by Patricia expert witness did not include Walter’s debt to NMP.

. Patricia’s expert also excluded Walter’s debt from this valuation, so it is comparable to the chancellor’s finding of the value at the time of the temporary order.

.This issue is remanded due to the chancellor’s failure to consider the character of the appreciation — whether active or passive — that accumulated after the chancellor’s use of the date of the temporary order as the line of demarcation. The purpose for remand is not, as the dissent suggests, based on the chancellor's decision to use the temporary order as the line of demarcation.